INTERSTATE BANKING & TRUST CO. v. BROWN et al.

In re LESSER–ELY COTTON CO.

(Circuit Court of Appeals, Sixth Circuit. July 20, 1916.)

Nos. 2717, 2718, 2885, and 2886.

1. BANKRUPTCY ⟠⟞151—REPRESENTATIVE POSITION OF TRUSTEE—STATUTE.

In proceedings relative to the bankruptcy of a firm of cotton factors by virtue of Bankruptcy Act, § 47a (2), as amended by Act June 25, 1910, c. 412, § 8, 36 Stat. 840 (Comp. St. 1913, § 9631), the trustee represented unsecured creditors with the same force and effect as if they had, on the date of the filing of the petition in bankruptcy, levied executions upon the cotton stored by the firm in a warehouse.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193, 239; Dec. Dig. ⟠⟞151.]

2. WAREHOUSEMEN ⟠⟞2—UNIFORM WAREHOUSING ACT—SUPERSESSION OF COMMON AND STATUTORY LAW.

Uniform Warehousing Act Tenn. (Acts 1909, c. 336), intended to cover the subject of the respective rights of holders of warehouse receipts and creditors of the depositors, has superseded all existing common or statutory law on the subject.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 2; Dec. Dig. ⟠⟞2.]

3. PLEDGES ⟠⟞11—VALIDITY AGAINST EXECUTION LEVYING CREDITORS—DELIVERY.

It is a general rule that a pledge, not followed by delivery, actual or symbolical, is invalid against execution levying creditors of the pledgor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 28–35; Dec. Dig. ⟠⟞11.]

4. FACTORS ⟠⟞19—PLEDGES—UNIFORM WAREHOUSING ACT—STRICT CONSTRUCTION.

Uniform Warehousing Act Tenn. (Acts 1909, c. 336), giving factors the right effectively to pledge the consignor's interest, which did not formerly belong to them, will be strictly construed.

[Ed. Note.—For other cases, see Factors, Cent. Dig. § 20; Dec. Dig. ⟠⟞ 19.]

5. WAREHOUSEMEN ⟠⟞2—UNIFORM WAREHOUSING ACT—STRICT CONSTRUCTION.

Uniform Warehousing Act Tenn. (Acts 1909, c. 336), recognizing the power of the depositor of goods in warehouse to pledge warehouse receipt so as to give a better title than he had and to disregard those rights which under the state's policy would otherwise accrue to the execution creditor, will be strictly construed.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 2; Dec. Dig. ⟠⟞2.]

6. WAREHOUSEMEN ⟠⟞12—WAREHOUSE RECEIPT—STATUTE.

Under Uniform Warehousing Act Tenn. (Acts 1909, c. 336) § 2, prescribing what every warehouse receipt must embody, receipts reading "Received in warehouse for the account of Lesser-Ely Company two hundred bales of cotton. Same to be held subject to the order of the Lesser-Ely Cotton Co. D. W. McLemore & Co., Warehousemen. No. Bales, 200"—was insufficient to come within the protection of the act as failing to describe the cotton for purposes of identification as required by clause F of section 2.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 19–24; Dec. Dig. ⟠⟞12.]

⟠⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. WAREHOUSEMEN ⊂⊃12—UNIFORM WAREHOUSING ACT—NEGOTIABLE RECEIPT.**

Uniform Warehousing Act Tenn. (Acts 1909, c. 336) § 5, providing that a receipt stating that the goods will be delivered to the bearer or to the order of any person named in such receipt, is a negotiable receipt, and that no provision shall be inserted in the negotiable receipt that it is non-negotiable, such provisions if inserted being void, does not convert into a valid statutory negotiable receipt a paper which fails to contain all the requisites of a statutory receipt, but sections 4 and 5 must be read in connection with section 2, cl. (d), providing that every warehouse receipt must embody the statement whether the goods received will be delivered to the bearer or to a specified person, or to a specified person or his order.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 19–24; Dec. Dig. ⊂⊃12.]

**8. WORDS AND PHRASES—"FUNGIBLE GOODS."**

"Fungible goods" are those of which each unit is fully equivalent to each other unit, an equivalency which may be inherent or may result from an agreement which may be expressed or implied from custom.

**9. WAREHOUSEMEN ⊂⊃20—FUNGIBLE GOODS—WAREHOUSE RECEIPT—UNIFORM WAREHOUSING ACT.**

Under Uniform Warehousing Act Tenn. (Acts 1909, c. 336) § 23, providing that if authorized by agreement or custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade, etc., where cotton warehousemen in the city had long been in the habit of issuing receipts which banks of the city and adjacent cotton country had been in the habit of treating as good for loans of $50 per bale, all of the bales of cotton in a warehouse of varying values did not become pro tanto fungible goods, so that holders of the warehouse receipts became tenants in common of the entire mass.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 15, 16; Dec. Dig. ⊂⊃20.]

**10. FACTORS ⊂⊃52—PLEDGES—RIGHT OF CONSIGNORS.**

Where the consignors of cotton to a firm of factors did not participate in an arrangement whereby the firm stored the cotton in a warehouse, taking blanket warehouse receipts which it pledged for loans in accordance with a custom of the vicinity, the consignors (having no knowledge of the custom permitting such blanket receipts) were not bound by estoppel by the pledges for the factors' debts accompanied by neither actual nor symbolical delivery, since estoppel cannot bind those not parties to an arrangement, and who never did anything on the faith of which another has acted.

[Ed. Note.—For other cases, see Factors, Cent. Dig. §§ 83, 84; Dec. Dig. ⊂⊃52.]

**11. WAREHOUSEMEN ⊂⊃15(3)—PLEDGES—RIGHTS OF CREDITORS OF FACTORS.**

General creditors of a firm of cotton factors, not parties to the arrangement and without knowledge thereof, which stored cotton in a warehouse, taking blanket receipts and pledging them to secure loans by banks, were not estopped by the pledge of the receipts.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 37; Dec. Dig. ⊂⊃15(3).]

**12. EXECUTION ⊂⊃113—EXECUTION CREDITOR'S SUPERIORITY OF LIEN—TENNESSEE LAW.**

It is the policy of Tennessee law that an execution creditor gets a lien superior to other prior liens which may be perfectly good as between lienor and lienee, but which have not been preserved against execution creditors in some manner provided by law.

[Ed. Note.—For other cases, see Execution, Cent. Dig. §§ 241–248; Dec. Dig. ⊂⊃113.]

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13. WAREHOUSEMEN ⊙⟹12—WAREHOUSE RECEIPTS—VALIDITY.

The rule that warehouse receipts are valid and enforceable both at their inception and thereafter, because intended to cover property which could always be identified, cannot extend to a case where no separate receipt covers all the property, but where the result is reached only by the aggregate of many independent receipts.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 19–24; Dec. Dig. ⊙⟹12.]

Appeal from the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Actions by the Interstate Banking & Trust Company and others against J. W. Brown, trustee in bankruptcy of the Lesser-Ely Cotton Company, bankrupt, and others; J. W. Brown against Commercial Trust & Savings Bank and others; Commercial Trust & Savings Bank and others against J. W. Brown; and State Savings Bank of Memphis against J. W. Brown. From a judgment of the District Court confirming conclusions of the referee, the Interstate Banking & Trust Company and others appeal. Vacated and case remanded for the entry of a modified judgment consistent with the opinion.

For some years prior to April, 1913, a business as cotton factors had been carried on, at Memphis, by the Lesser-Ely Company, a partnership, of which Lesser was the active head. On the 25th day of April, Lesser disappeared. It was at once evident that the company was insolvent, and an involuntary petition in bankruptcy was filed on April 26th. This was duly followed by adjudication; and these controversies arise between adverse claimants in the administration of the bankrupt estate.

As the business was regularly carried on, the Lesser-Ely Company received (e. g.,) a consignment of 10 bales of cotton. The consignor might be the grower or the grower's vendee. Each bale bore a tag which, by gin marks and otherwise, identified this bale from all others and enabled it to be traced back to the grower and the ginner. The Lesser-Ely Company paid the freight and similar expenses, perhaps made or had already made advances to the consignor on account of the selling price, and deposited the bales in a certain Memphis warehouse. Eventually, the cotton was sold, and the selling price, less charges and expenses, commissions and advancements, remitted by the Lesser-Ely Company to the consignor. Sometimes the Lesser-Ely Company itself, by sufficient advances or by outright purchase, became the owner of cotton and thereafter sold to others. The warehouseman did not issue to the Lesser-Ely Company warehouse receipts from day to day as the cotton was received and stored, but issued such receipts from time to time as requested by the Lesser-Ely Company, each receipt covering 100 bales, or some convenient number. These receipts did not identify the bales of cotton to which they referred, but each one was in the form shown by the specimen given in the margin.[1] The Lesser-Ely Company used these receipts as collateral in borrowing money from banks and individuals in Memphis and the tributary cotton country, borrowing, usually if not always, $50 against each bale supposed to be represented by the receipt. When the bankruptcy came, it appeared that there were in the warehouse about 2,000 bales deposited by the Lesser-Ely Company, and that there were outstanding as collateral in the possession of these banks and individual lenders warehouse receipts for about 5,000 bales. This situation resulted from the fraud of Lesser, and the negligence of the warehouseman. All parties exonerate the latter from intentional

---

[1] "Cotton Warehouse of D. W. McLemore & Co., 129 and 163 East Webster Street.

"No. 7.                                                      Memphis, Tenn., Oct. 8th, 1912.

"Received in warehouse for the account of Lesser-Ely Company two hundred bales of cotton. Same to be held subject to the order of Lesser-Ely Cotton Co. D. W. McLemore & Co., Warehousemen." No. Bales, 200.

fraud, but he issued receipts as requested by Lesser without insisting upon the deposit of additional bales or the cancellation of old receipts in equivalent amount, and he trusted Lesser not to ask for receipts which were not against cotton on hand. The bankrupts were also largely indebted to general creditors.

Under the direction of the court, the entire 2,000 bales were sold by the bankruptcy trustee, and the sale proceeds of each bale or lot separately entered. Many intervening petitions were filed by cotton claimants, but it was determined that the cotton should be sold and all existing claims and liens transferred from the cotton to the proceeds. The cotton so sold was divisible into two classes: First, that in which the total of the Lesser-Ely Company's expenses, charges, and advances was less than the selling price. As to this cotton, it was evident—as between the consignor and the Lesser-Ely Company —that title had remained in the consignor, subject to the Lesser-Ely Company's lien or interest for the amount due it. The second class included those bales which had been purchased by the Lesser-Ely Company or as to which its charges and advancements were greater than the sale price. As to these, it was evident that the Lesser-Ely Company's resulting interest, legal or equitable, covered the entire title to and interest in the cotton.

The intervening petitions were by consignors and by receipt holding pledgees. The consignors demanded their respective bales of cotton, subject to such charges and advances as existed. Each holder of a warehouse receipt as collateral security demanded the number of bales called for by his receipt. The bankruptcy trustee answered and claimed title superior to the consignors and the receipt holders. The receipt holders denied the right of the consignors, and the consignors denied the right of the receipt holders; and many subordinate controversies also arose as to special rights or defenses alleged by or against individual claimants. It is sufficient for present purposes to say that the referee held that the claims of the consignors were valid against both trustee and receipt holders; that as to the remainder of the property, after that identified by the consignors was withdrawn, and including the surplus value over the consignor's interest in cotton partly paid for, the receipt holders were tenants in common, among whom the fund should be distributed proportionately; and that the bankruptcy trustee took nothing. These conclusions were confirmed by the district judge, excepting that he disallowed entirely, because usurious, the claim of the largest receipt holder. This receipt holder, the Interstate Banking & Trust Company, brings appeal No. 2717, the bankruptcy trustee brings appeal No. 2718, and other receipt holders bring appeals Nos. 2885 and 2886.

G. T. Fitzhugh and I. W. Crabtree, both of Memphis, Tenn., for trustee.

T. E. Cooper and St. John Waddell, both of Memphis, Tenn., for certain petitioners and consignees.

W. H. Fitzhugh, of Memphis, Tenn., for Commercial Trust & Savings Bank and others.

W. P. Armstrong, of Memphis, Tenn., for W. A. Gage & Co. and others.

J. L. McRee, of Memphis, Tenn., for State Sav. Bank.

Luke E. Wright, of Memphis, Tenn., and J. W. Cutrer, of Clarksdale, Miss., for Interstate Banking & Trust Co.

Caruthers Ewing, of Memphis, Tenn., for C. D. Smith.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1] By virtue of the amendment of June, 1910, to section 47a (2) of the Bankruptcy Act, this trustee represents creditors not secured by receipts with the same force and effect as if these unsecured creditors had, on April 26th, levied executions upon the cotton in the ware-

house. This property came into the custody of the bankruptcy court, and titles or liens which, under the law of Tennessee, would have prevailed against such levying creditors are superior to the title of the trustee; all others must yield to that title. Bailey v. Baker Co., 239 U. S. 268, 275, 36 Sup. Ct. 50, 60 L. Ed. 275; In re Farmers' Co. (D. C.) 202 Fed. 1005; s. c. (D. C.) 202 Fed. 1008; In re Williamsburg Co. (D. C.) 190 Fed. 871, reversed, but on other grounds, in Holt v. Henley, 232 U. S. 637, 34 Sup. Ct. 459, 58 L. Ed. 767; In re Bazemore (D. C.) 189 Fed. 236; In re Floyd-Scott Co. (D. C.) 224 Fed. 987, 989.

[2] The rights of the receipt holders, as against the trustee, must depend upon the so-called Uniform Warehousing Act, existing in Tennessee as chapter 336 of 1909. This act, as is obvious by its title [2], was intended to cover the subject of the respective rights of holders of warehouse receipts and creditors of the depositors, and it has superseded all existing common or statutory law on this subject. Commercial Bank v. Canal Bank, 239 U. S. 520, 529, 36 Sup. Ct. 194, 60 L. Ed. 417.

[3] All parties assume it to be the law of Tennessee, as is the general rule, that a pledge, not followed by delivery, actual or symbolical, is invalid against execution levying creditors of the pledgor. It is even held that the levying officer takes a title to the property. See Herman v. Katz, 101 Tenn. 118, 126, 47 S. W. 86, 41 L. R. A. 700. No actual delivery is here claimed and there is symbolical delivery, if at all, only by virtue of these warehouse receipts, resting upon this statute.[3] If they are such negotiable receipts as the statute contemplates, it follows by the very words of sections 25 and 41 [4] that those who have, in good faith, taken them from a factor as security for present loans, take a title superior to that of consignor or of the fac-

_____

[2] " * * * To fix and define rights of creditors of alleged owners of warehouse goods; * * * to define and fix the rights of persons holding warehouse receipts and their assignees and transferees. * * * "

[3] Whether or not it is accurate to call such delivery symbolical, rather than actual (Union Co. v. Wilson, 198 U. S. 530, 536, 25 Sup. Ct. 766, 49 L. Ed. 1154), the nomenclature of the text is not uncommon, and is intelligible.

[4] "Section 25. Be it further enacted, that if goods be delivered to a warehouseman by the owner or by a person whose act in conveying the title to them to a purchaser in good faith for value would bind the owner, and a negotiable receipt is issued for them, they cannot thereafter, while in the possession of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution unless the receipt be first surrendered to the warehouseman or its negotiation enjoined. The warehouseman shall in no case be compelled to deliver up the actual possession of the goods until the receipt is surrendered to him or impounded by the court."

"Section 41. Be it further enacted, that a person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

"(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him."

tor's levying creditors.  Commercial Bank v. Canal Bank, supra.  If they are not such negotiable receipts, the title and rights of the consignor and levying creditor remain untouched thereby.  So, we come directly to the controlling question:  "Are these the negotiable receipts contemplated by the act, and, particularly, by sections 25 and 41 ?"

[4, 5] In so far as concerns the present question, this statute is one to be construed strictly rather than with any great liberality.  Prior thereto, factors had a right to pledge to the extent of their interest, but no further.  The statute gives them the right effectively to pledge the consignor's interest, which did not belong to them, and so far as it thereby permits them to destroy an otherwise existing legal interest, it surely calls for strict construction.  As to property owned by the warehouse depositor but subject to secret liens, this statute in some jurisdictions created and in others recognized the power of the depositor to pledge his warehouse receipt so as to give a better title than he had and so as to destroy those rights which under the policy of the state would otherwise accrue to the execution creditor; and this, too, calls for strict construction.

Following its plan of either creating, or recognizing and then regulating, a class of instruments having defined attributes and results, section 2 defines those receipts concerning which the act speaks, and to which, by sections 25 and 41, it gives peculiar force.  Sections 2, 4, and 5 are quoted in the margin.[5]

[5] "Section 2. Be it further enacted, that warehouse receipts need not be in any particular form, but every such receipt must embody within its written or printed terms:

"(a) The location of the warehouse where the goods are stored.

"(b) The date of issue of the receipt.

"(c) The consecutive number of the receipt.

"(d) A statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order.

"(e) The rate of storage charges.

"(f) A description of the goods or of the packages containing them.

"(g) The signature of the warehouseman, which may be made by his authorized agent.

"(h) If the receipt is issued for goods for which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership. And:

"(i) A statement of the amount of advances made and of liabilities incurred, for which the warehouseman claims a lien. If the precise amount of such advances made or of such liabilities incurred is at the time of the issue of the receipt unknown to the warehouseman or to his agent who issued it, a statement of the fact that advances have been made or liabilities incurred and the purpose thereof is sufficient.  A warehouseman shall be liable to any person injured thereby for all damage caused by the omission from a negotiable receipt of any of the terms herein required.

"Section 4. Be it further enacted, that a receipt in which it is stated that the goods received will be delivered to the depositor or to any other specified person is a nonnegotiable receipt.

"Section 5. Be it further enacted, that a receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt, is a negotiable receipt.

"No provision shall be inserted in a negotiable receipt that it is nonnegotiable.  Such provisions, if inserted, shall be void."

Section 2 requires that the receipt "must embody" eight elements, but one of them (h) is in contingent form, and so is to be excluded from any enumeration of imperative requirements. One (d) allows an alternative · form, and one (i) specifies modifications which may sometimes be permitted. The receipts given in the present case· omit element (h), but that is unimportant because the contingency which required its inclusion did not exist. They also omit elements (e) and (i); and interesting resulting questions as to their validity and force have been argued. Language cannot be more imperative than that of the first clause of the section, which says "every such receipt ·must embody" the above-mentioned eight elements; and it is, to say the least, not clear how the last sentence of (i) can operate tò make immaterial the omission of any one of the elements which it has been declared must be embodied.[6] This sentence is:

"A warehouseman shall be liable to any person injured thereby for all damages caused by the omission from a negotiable receipt of any of the terms herein required."

If a paper from which one of the terms required by section 2 has been left out· is · nevertheless a "negotiable receipt," and so gives to the good-faith holder thereof all the rights declared by various parts of the statute, it is not easy to see how such holder could suffer "damages caused by the omission." On the other· hand, if the omission of a prescribed element from what otherwise would be a negotiable receipt makes the receipt invalid and so deprives the holder of his otherwise existing rights thereunder, there would be "damages caused by the omission," and this sentence would have applicability and force; yet that theory is not wholly satisfactory. If the effect of this sentence is confined to the clause in which it is found (i), and if the warehouseman's lien is treated as valid in spite of the omission properly to claim it, the sentence could be intelligently applied in all cases.

[6] However, we think it not necessary to decide what the effect may be of failing to state the rate of charges or the advances claimed. A more noticeable, and perhaps a more substantial, defect exists as. to, element (f). This specification—that the receipt must contain a description of the goods—probably adds nothing to existing requirements as to any document which was to accomplish symbolical delivery. Its purpose, unquestionably, is to provide for identification. We do not need to consider how complete the description must be on the face of the paper, or how far parol evidence may be resorted to in aid of identification; somehow, and perhaps with such aid, the receipt must have, or be given, efficient reference to the property which is to be symbolically delivered. That these receipts do not satisfy this criterion is too plain for controversy. Indeed, in real intent, these were never considered as warehouse receipts. .The office of such receipts is to evidence the delivery and deposit of certain articles; they are the depositor's vouchers; these receipts had no such function; they were only intended to be certificates or undertakings by the ware-

6 As is thought by the Supreme Court of Illinois, in Manufacturers Co. v. Monarch Co., 266 Ill. 584, 107 N. E. 885.

houseman that the depositor should thereafter keep up and maintain his deposit to a fixed minimum. No amount of parol evidence would be sufficient to show to what particular bales of cotton one of these receipts for 100 bales was intended to refer, since, in fact, it never was intended to refer to any particular bales; neither with nor without parol aid can such a receipt create identity, or point out identity which never existed. This is so clear that it would dispose of the case, as against the receipt holders, save for one thing yet to be discussed.

[7] Before coming to that, we notice sections 5 and 6. We cannot think that section 5 has the effect to convert into a valid statutory negotiable receipt a paper which is not a statutory receipt at all. Sections 4 and 5 must be read in connection with clause (d) of section 2. These later sections apply to receipts issued under and sufficiently complying with section 2, and classify them according to the alternative found in (d). The final result is the same as if the fourth element, which "every such receipt must embody," was specified:

"(d). A statement whether the goods received will be delivered to the bearer or to a specified person or to a specified person or his order; if to a specified person, the receipt is nonnegotiable; if to bearer or to a specified person or order, it is negotiable."

If it could be assumed that the definition of a negotiable receipt found in section 5 was intended to be exclusive and complete in itself, it would follow that even the signature of the warehouseman required by section 2 (g) would be quite unnecessary; and, of course, this cannot be.

[8, 9] The special situation just mentioned thus arises: Some of the cotton warehouses in Memphis, including this one, had long been in the habit of issuing receipts in this form, and some, at least, of the Memphis banks and of the banks in the adjacent cotton country had been in the habit of treating such receipts as good for loans of $50 per bale; and it is said there was a custom whereby each bale of cotton was, for this particular purpose, the equivalent of any other bale, and hence that warehouse receipts with this general and indefinite description are as valid as are similar receipts for so many bushels of grain in an elevator. In reaching this conclusion, reliance is placed upon section 23 of the act, also quoted in the margin.[7] The argument is made that by virtue of this section as applied to this custom and to the particular facts of this case, all the bales of cotton in the warehouse became pro tanto fungible goods, and so the receipt holders became tenants in common of the entire mass.

We do not find that this section has been construed by other decisions in a way here helpful, and we must, without such aid, determine its force as applied to the present case. It seems a proper sum-

---

[7] "Section 23. Be it further enacted, that if authorized by agreement or by custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole."

mary of text-book definitions, as modified by this section, to say that
fungible goods are those of which each unit is fully equivalent to each
other unit; that this equivalency may be inherent or may result from
agreement; and that such agreement may be express or may be im-
plied from custom. Further, it seems obvious that goods may be
of one of three classes: Inherently fungible, or capable of acquir-
ing that quality by agreement, or quite incapable thereof. Bushels of
wheat of the same grade are necessarily the equivalent of each other;
barrels of flour may or may not have that mutual relationship—pre-
sumptively, they do not (Jones on Collateral Securities, §§ 317, 318)
—though the interested parties may intelligibly consent that flour shall
be so considered; but that there should be any express agreement or
any contract-raising custom whereby a bolt of cloth and a case of
boots and shoes should be treated as equivalent to each other is beyond
comprehension. We take it, the statute, section 23, must mean only
that the right of the warehouseman to mix articles so as to lose their
identity and his right to deliver on a receipt, not the thing which he
received but other equivalents, are to be confined to the first two classes
of articles above mentioned, viz., those inherently equivalent to each
other, and those which may be so, and which, therefore, can rightfully
be thought of as subject to an agreement or a custom to that effect,
but that these rights do not extend to articles where mutual equiva-
lency is inherently impossible. To use the foregoing illustration we
cannot comprehend an agreement or custom which would authorize a
warehouseman to deliver boots and shoes in satisfaction of his re-
ceipt for cloth.

Bales of cotton certainly do not belong to the first group; their
mutual equivalency is not clear and certain. A lot of bales coming
from one source might belong to the second group; their equivalency
would be so possible, if not probable, that an agreement or custom
therefor might well exist. The evidence, however, puts beyond con-
troversy that cotton bales in a large mass, such as would accumulate
in any general warehouse, and such as did accumulate in this ware-
house, are as inherently incapable of acquiring this mutual equivalency
as would be the cloth and the boots and shoes. The cotton in such
bales is of all varieties, qualities, and grades, and the bales themselves
are of various sizes. The actual selling value of the bales involved
in this controversy varied from a minimum limit of about $20 to a
maximum limit of about $90, and the variation was arbitrary by units,
or by small lots. The figures brought here do not show results for
each bale, but only as to the lot belonging to each consignor, by which
can be stated the average price 2 bales or 5 bales or 10 bales. These
figures cover about 1,000 bales out of the 2,000 involved. There is
no reason to think that there was any more uniformity among the
other thousand.[8] It necessarily results that this section, 23, has no
bearing on the case. Even if it had, its only effect is to authorize an
intermingling which never did in fact take place. No one claims that

[8] As said of the 40 bales of corks, in Llado v. Morgan, 23 U. C. C. P. 517, 525,
"it seems impossible to apply any custom we have ever heard of to a case like
this."

the identity of any single bale was ever lost, from the beginning to the end.

It is only illustrative of the difficulty which the receipt holders here have, in standing upon section 23 and the supposed custom, to query what would happen if the holder came to the warehouse and demanded the bales of cotton called for by his receipt. Who could say what bales he should have? If he had loaned $50 per bale, must he take those bales that were worth $20 or could he take the $90 bales and leave the poorer ones for later comers? If the warehouseman were indifferent, an execution creditor or a consignor would not be. No theory of fungibility can answer these questions.

[10] The real strength of the receipt holders' claims lies, not in any such theory nor in reliance on section 23 of the act, but in an application of the theory of estoppel. The depositing factor owned varying interests in the bales of cotton in the warehouse. This interest without aid from the statute it could transfer by way of security to those who would lend money thereon. Almost any kind of a transfer would be good, as between the parties, at least when it came to the equitable distribution of a fund. Here steps in the custom, by which this type of receipt evidenced some kind of an undivided interest in the factor's title. With the aid of this custom, it is to be seen that the factors agreed that their cotton should be subject to these receipts in any proper way which the courts might be able to work out as between the parties, and that the money lenders acted on the faith of such understanding; that the warehousemen issued these receipts knowing that they were to be thus used; and that the lenders of the money accepted these receipts knowing or being bound to know that other similar ones were being issued to and accepted by other lenders. Here is a perfect estoppel as against each of the three participating parties; and while there would be many difficulties, some of which are illustrated in this case, in determining and enforcing the respective rights of all the parties, it may be assumed that a court of equity, if not a court of law, could find a way to do so, and that no one of the three could be heard to complain; but we are not now considering the complaints of parties; we have to deal with the complaints of strangers. Estoppel cannot bind those who were not parties to the arrangement and who never did anything on the faith of which another has acted. The consignors did not participate in this arrangement directly or indirectly. They had no knowledge of the custom permitting such blanket receipts. Let it be assumed that they were bound to know that they might lose their title to their consigned cotton by the issue to the factor and the pledge by him of a statutory warehouse receipt for that specific cotton; this does not imply that they subjected their cotton to any further risk of which they were ignorant or that they can be bound by a pledge for the factor's debt accompanied by neither actual nor symbolical delivery. We are satisfied that the court below rightly held the consignors' title superior to any lien, legal or equitable, in favor of the receipt holders.

[11, 12] We cannot distinguish the case of the general creditors, represented by the trustee as if with executions levied, from the case

of the consignors. The general creditors are not estopped; they are not parties to any such arrangement; they had no knowledge of any such custom (so far as the record shows). It is, as we have seen, the policy of the Tennessee law that an execution creditor gets a lien superior to other prior liens which may be perfectly good as between lienor and lienee, but which have not been preserved against execution creditors in some manner provided by law. We therefore are bound to conclude that the trustee in bankruptcy, for the benefit of all creditors, took a title superior to any claim by a receipt holder, even though the holder might have been able to enforce his claim as against the factor or those in its shoes; and that the trustee, as far as may be required by the claims of the creditors he may finally represent, must take what is left of the fund after the consignors are satisfied; but to the consignors' title the trustee must yield, for it is the prior title, and no rule of law displaces it for the benefit of execution creditors.

The receipt holders have other difficulties to meet—the universality of the custom set up is not clear; much of the cotton which came to the trustee was not in existence when some of the receipts were given; at the date of some receipts, there was no cotton in the warehouse not already appropriated, etc. These become immaterial.

[13] If no one were here interested except the estopped parties, we might, perhaps, give controlling effect to the fact that the outstanding receipts called for a total number of bales greater than the entire number in the warehouse. Even as against consignors or execution creditors, a receipt might be valid which, in terms, covered all the cotton in the warehouse or in a certain compartment. It might, for the purpose of this discussion, even be conceded that a receipt would be unimpeachable which covered all the cotton which from time to time might be in a certain location, and which, therefore, contemplated continual substitution. No one of these concessions reaches this case. The receipts in the supposed instances might be valid and enforceable both at their inception and always thereafter, because they would be intended to cover property which could always be identified. Such a rule cannot extend to a case where no separate receipt covers all the property, but where this result is reached only by the aggregate of many independent receipts. It cannot be that the validity or enforceability of such important instruments as warehouse receipts should be almost a matter of chance, and that they should be good to-day, bad to-morrow, and good the next day, at the whim of the depositor. If receipts which are inoperative because they describe nothing became enforceable when their sum total becomes greater than all the property involved, they will, of course, lose that enforceability when their total falls below the amount of property on hand. It would follow that, if there were 1,000 bales in the warehouse and receipts outstanding for 990 bales, which receipts were invalid because not identifying anything, the depositing factor could, intentionally or inadvertently, make them all valid by selling 15 bales out of stock or by obtaining and negotiating another receipt for 15 bales; and the next day he could make them all invalid again by depositing a few

more bales in the warehouse or by paying and taking up one of the outstanding receipts. We can see no reason for thinking that the superior title of the consignor can appear and disappear in this fortuitous way; nor can we see any vital distinction on this issue between the rights of the consignors and the rights of the bankruptcy trustee under the amendment of 1910. As is said by counsel for one of the receipt holders, speaking of the execution of receipts for 5,000 against a holding of 2,000:

> "That is a matter to be considered in a distribution of the fund between the holders of warehouse receipts, but has no relevancy whatever to the legal rights of the parties."

Few of the decisions cited by counsel are pertinent enough to need comment. In Manufacturers Co. v. Monarch Co., supra., the point decided was that the paper given by the warehouseman did not fail to be a statutory negotiable receipt merely because it omitted the rate of charges. Union Trust Co. v. Trumbull, 137 Ill. 146, 27 N. E. 24, involved the necessity of identification, but it was held that the party who was a common-law assignee stood in the shoes of his assignor, the depositor, and so that the controversy had the same aspect as if between the depositor and the receipt holders. It is admitted (137 Ill. 178, 27 N. E. 24) that further identification would be necessary for many purposes, and the result reached is based upon the mutual estoppel of all parties. No rights of any person not estopped are involved. Stewart v. Phœnix Co., 9 Lea (77 Tenn.) 104, applies the rule of estoppel against the warehouseman, and touches no other rights. Bank v. Haselton, 15 Lea (83 Tenn.) 216, holds that the property involved there was really fungible. The blanket description in the receipt was therefore sufficient, and the receipt became immune to attack on this ground. The opinion, with seeming purpose, omits bales of cotton from its list of the class of property which was under discussion (pages 244, 245). In Bank v. Bryant, 49 La. Ann. 467, 473, 22 South. 89, 93, we find pertinent comment, meriting quotation. There was in use, in New Orleans, a form of cotton warehouse receipt generally similar to that used in Memphis, and a controversy arose between the holder of such a receipt and the administrator of the depositing cotton factor. The latter claimed under an equally vague warehouse receipt, but of later date. It was held that the administrator had no higher rights than the depositing factor and could not dispute the truthfulness of the earlier receipt which he had pledged to his creditor. In the course of the opinion, and after describing the New Orleans custom, the court says:

> "The practice which we have alluded to is not only a very loose but a very dangerous one to all parties relying upon it. Under its operation as claimed, a factor having stored in a press several lots of cotton, part of which he could legally sell or pledge and part of which he could not legally pledge for his own debt, can leave a part of it unreceipted for and cause to be executed to himself special receipts for a limited number of bales, leaving their identity (so far as the receipts themselves are concerned) undetermined. He can then pledge these special receipts to a bank for a loan of money, but before the particular cotton to be covered by the receipts is fixed in favor of the bank or pledgee, he can sell the cotton which he was authorized to sell or pledge to a third person, and through the instrumentality of an order directed to

the press, ordering them to deliver that specific cotton to parties named, he can withdraw it from the possession of the proprietors of the warehouse, and from the possible operation of the warehouse receipts, and drive the holders of the receipts into an unsuccessful litigation with the owners of the cotton still on hand. Civ. Code, arts. 1921, 1922. The lenders, in the end, will find themselves, unless, under exceptional circumstances, the holders of worthless pieces of paper. Even if matters in some given case did not go to the full extent here supposed, the lenders, under the operation of this loose practice might be driven in execution of their collaterals, upon a worthless grade of cotton; whereas, had they taken the simple precaution of causing the marks of specific cotton to be inserted in the receipts, they would have been amply protected. So long as business men elect to deal in this way, in order by affording commercial facilities to their customers, to retain their business, they must not be surprised that they should occasionally be called upon to suffer loss."

In a generally similar situation at Little Rock, the warehouseman was held to a double liability, and the Supreme Court of Arkansas said (Citizens' Bank v. Arkansas Co., 80 Ark. 601, 613, 96 S. W. 997, 1002 (117 Am. St. Rep. 102):

"In fact, this custom that the compress company relies on seems to have been based on the theory that all men were honest, * * * but this loose method of doing business was calculated to attract the attention of dishonest commercial adventurers. That years passed before any harm was felt speaks well for the honesty of those dealing with cotton in this market. But the unscrupulous man arrived at last, and then a day dawned full of danger to these unsuspecting dealers."

The one decision which seems indistinguishable from the instant case (save that the receipt called for less than the whole number of bales in existence—and we have pointed out the insufficiency of this distinction) is that of the Supreme Court of Louisiana in Gragard's Succession v. Bank, 106 La. 298, 30 South. 885. Similar receipts were asserted by the holder against the general title of the administrator of the depositing factor. So far as concerns the binding effect upon the administrator of the estoppel which existed against the factor himself, the case necessarily overrules Bank v. Bryant, though without mentioning that then still recent case. It is to be noted that two of the justices participating in Bank v. Bryant, dissent in the later case. What the court says regarding the position of the administrator applies with even greater force to the position of the bankruptcy trustee since 1910 (106 La. 300, 30 South. 886).

"To deny to this administrator, therefore, a standing to contest the validity of a pledge would be to deny the same right to the creditors; and to deny the right to the creditors would be the exact equivalent of asserting one of the two things, either that under the Louisiana law invalid pledges are as effectual as valid pledges, or that under Louisiana law invalid pledges are made valid by the death of the pledgor" [bankruptcy of depositor].

The court then distinctly determines the invalidity of the receipts in this language:

"On such a receipt the warehouseman could not possibly make any delivery. Abundant testimony to that effect is found in the record. Between the different bales of the cotton there might be great variance, nearly or fully as one to four; that is, one bale may contain nearly twice as much cotton as another and the cotton be of a quality twice as valuable. And in the case of this particular cotton, there was a further and, if possible, a more serious dis-

parity between the different bales; some of it the decedent had not a legal or even a moral right to pledge, whereas some he had a perfect right to pledge. This circumstance added infinitely to the already fatal uncertainty of the receipt, for until proof to the contrary should be administered the presumption would have to obtain that the decedent intended to pledge, and the defendant bank intended to receive in pledge, only those bales which the decedent had the right to pledge, and the identification of these bales in the absence of any designation of them was utterly impracticable.

"We must hold that, owing to the indeterminateness of the property intended to be pledged, there was no delivery, and in consequence no pledge. A warehouse receipt in the form prescribed by Act 72 of 1876 may stand for the goods themselves, in such way that its delivery will operate a delivery of the goods; but in order that this should be, the receipt must represent specific goods, or, at any rate, must represent a specific part of a common, or uniform, mass; and, as just shown, a lot of cotton bales cannot be treated as a common or uniform mass, especially when, to the physical disparity of the component bales, there is added a moral and legal disparity."

The purported taking possession of the cotton by one receipt holder on the day before the bankruptcy was, obviously, ineffective, when the rights given by the receipts themselves are treated as we find they must be. If such taking possession were given effect, it would accomplish a preference, and we have no doubt this receipt holder was chargeable with knowledge that the result of sustaining the change of possession (if there was any) as creating a definite lien would be to bring about the forbidden inequality.

Although it is quite unnecessary, for the purposes of these appeals, to decide whether the loans from the Interstate Banking & Trust Company were usurious, and, if so, what the effect would be, yet we have seriously considered whether we ought to express our opinion thereon, based upon the present record. If this company has filed proof of its claim in bankruptcy, or if the intervening petition shown by the present record shall be thought amendable so as to become a formal proof, or if the decree herein is thought to be a "liquidation" (questions concerning which we intimate no opinion),[9] the same question may come back to this court hereafter; but upon the controlling question of fact, further evidence may be developed and the distinct issue which would be presented under such a proof of claim has been argued on the present appeal only incidentally. Upon the whole, we think it best not now to undertake any decision.

It results that the decree below must be vacated, and the case remanded for the entry of a modified decree consistent with this opinion. The trustee should recover the costs of his appeal (No. 2718). Each of the appellants in the other three appeals has already paid the bulk of the costs involved therein, and since apportioning among all the parties entitled the small remaining costs which might be awarded against these appellants would be difficult, the order will be that no costs will be recovered in any one of these appeals (Nos. 2717, 2885, and 2886). Claims of counsel for compensation from the fund coming to the trustee should be disposed of by the bankruptcy court.

[9] Loveland on Bankruptcy (4th Ed.) §§ 332, 333.