J. B. LEE, JR. *v.* FIRST NAT. BANK OF DYERSBURG *et al.**

*(Jackson.*   April Term, 1924.)

1.   **BANKS AND BANKING.**  Agent bank holding warehouse receipts for principal as collateral held not liable to him for conversion in permitting mingling of goods.

Evidence *held* to show that holder of accepted draft on buyer of cotton for purchase price secured by warehouse receipts for cotton held by bank acquiesced in action of bank in permitting intermingling of cotton with other cotton, so that such intermingling did not constitute conversion by bank, in view of Acts 1909, chapter 336, sections 23, 58, subsec. 3 (Thomp. Shan. Code, sections 3608a22, 3608a63), holder becoming pledgee of an interest in common in mingled cotton with rights of a purchaser of receipts, and such title to cotton as depositor had in view of Acts 1909, chapter 336, section 41, subsec. 1, and section 58, subsec. 10 (Thomp. Shan. Code, section 3608a43, subsec. 1, and section 3608a63, subsec. 10). (*Post,* pp. 287-290.)

Acts cited and construed: Acts 1909, secs. 23, 41, 58; ch. 336.

Case cited and distinguished: Interstate Banking & Trust Co. v. Brown, 235 Fed., 32.

Code cited and construed: Secs. 3608a22, 3608a43, 3608a63 (T. S.).

2.   **BANKS AND BANKING.**  Act of agent in permitting goods in warehouse pledged to principal to be shipped to prospective market held not conversion.

Holder of accepted draft on buyer of cotton for purchase price secured by warehouse receipts for cotton held by bank *held* not entitled to recover from bank for conversion by reason of bank's permitting cotton in warehouse to be shipped to New England, evidence indicating that best prospect for disposing of cotton was to ship it to warehouse in east.   (*Post,* pp. 290, 291.)

3.   **PRINCIPAL AND AGENT.**  Trusts.  Agent and trustee held only to exercise of good faith and diligence.

An agent or a trustee is only held to exercise of good faith and due diligence. (*Post, pp.* 291, 292.)

Case cited and approved: Dietz v. Mitchell, 59 Tenn., 678.

## FROM DYER.

*Headnote 1. 7 C. J. Banks & Banking, § 241; 11 C. J., Confusion of Goods, § 8; 2. 11 C. J. Confusion of Goods, § 241; 3. 39 Cyc, Trusts, p. 295; 2 C. J., Agency, § 381.

Appeal from the Chancery Court of Dyer County.— HON. V. H. HOLMES, Chancellor.

CRAIG, BULLOCK & DURHAM, for appellant.

S. GRANGER LATTA and WALTER S. DRAPER, for appellees.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

As it reaches us this case involves the liability of defendant First National Bank of Dyersburg to the complainant, J. B. Lee, on account of certain cotton transactions hereafter detailed. The chancellor dismissed the bill, and complainant has appealed to this court.

The complainant, J. B. Lee, is a farmer and cotton dealer living at Gates, Tenn. Prince & Hubbard were formerly cotton dealers at Dyersburg, Tenn. In February, 1920, Lee sold to Prince & Hubbard sixty-one bales of cotton at thirty-one cents a pound, amounting to $9,563.44. By an arrangement between the parties this cotton was shipped by rail from Gates, Tenn., to Lee's own order, care of the Dyersburg Compress Company at

Dyersburg. At the same time Lee drew a draft on Prince & Hubbard for $9,563.44, payable at ninety days, to which draft bills of lading for the cotton shipped as aforesaid were attached. This draft was made payable to the Gates Banking & Trust Company, and was forwarded by that bank to the First National Bank of Dyersburg. Pursuant to the said arrangement the First National Bank of Dyersburg procured Prince & Hubbard's acceptance of the draft, released the bills of lading, and permitted the delivery of the cotton to the Dyersburg Compress Company, and secured from the Dyersburg Compress Company warehouse receipts for the cotton—sixty-one bales. The First National Bank undertook to hold warehouse receipts for sixty-one bales of cotton to secure the payment of the aforesaid acceptance of Prince & Hubbard.

The draft accepted by Prince & Hubbard was returned by the First National Bank of Dyersburg to the Gates Banking & Trust Company, and by the latter bank turned over to complainant Lee. Lee desired to negotiate a loan from the Gates Banking & Trust Company, pledging the acceptance of Prince & Hubbard, and the cashier of that bank agreed to take the matter up with his directors. When the First National Bank of Dyersburg returned the acceptance of Prince & Hubbard it did not return the warehouse receipts, which it had taken to secure said acceptance, but merely sent to the Gates Banking & Trust Company a trust receipt, showing that the First National Bank of Dyersburg held sixty-one warehouse receipts on this account. The cashier of the Gates Banking & Trust Company desired the warehouse receipts to submit to his directors, along with the acceptance of Prince & Hubbard, when he took up with them the matter of the

loan to complainant Lee. The cashier thereupon wrote to the First National Bank of Dyersburg under date of March 6, 1920, as follows:

"The draft of J. B. Lee, Jr., for $9,563.44, has been returned with Prince & Hubbard's acceptance thereon. We thank you for your kindness in the matter, and I will ask you to forward sixty-one W. H. receipts representing the sixty-one bales of cotton. When the draft is due and payable I will be glad to send same to you for collection if you will quote exchange charge by you for handling paper of this kind.

"Yours truly, L. L. McDEARMAN, Cashier."

This letter was not immediately answered, and Mr. McDearman testifies that he called up Mr. Latta, the cashier of the First National Bank of Dyersburg, and had a conversation about these warehouse receipts. McDearman said that in this conversation Latta told him it would be impossible to send the receipts, as they had to be left in the Dyersburg Bank for the convenience of Prince & Hubbard, "as it was the custom of exchanging these receipts for other receipts." McDearman adds that he told Mr. Latta: "I was not in a position to give him the authority of having those original receipts exchanged. He told me that he would have Mr. Prince then to take the matter up with Mr. Lee."

For the sake of clearness we should at this point explain what was meant by exchanging warehouse receipts, or "substitution," as the practice is elsewhere in the record characterized.

It seems that when a cotton dealer buys cotton from a country merchant or grower he acquires cotton of different grade, staple, and general character. When the dealer sells to the mills his orders are as a rule for cot-

ton of even running grade, staple and general character. So that to fill a particular order the dealer has to take bales of cotton out of various purchases. Thus a custom has grown up among some dealers of commingling all cotton bought in a warehouse or concentration point. To facilitate the business of such cotton dealers a custom has grown up among some banks, holding warehouse receipts as collateral, of permitting cotton dealers to take down receipts covering particular bales of cotton, by the substitution of other warehouse receipts for other bales of cotton. In short such dealers and such banks ignore the identity of different lots of cotton, and treat one bale of cotton as the equivalent of another bale.

So the First National Bank of Dyersburg, by way of aiding Prince & Hubbard, had been allowing them this privilege or substitution of warehouse receipts held by that bank as collateral for acceptances and other obligations of that firm.

It is apparent from the testimony of Mr. McDearman and of Mr. Latta that this system was explained to Mr. Dearman in the telephone conversation above mentioned. On March 10, 1920, the First National Bank of Dyersburg addressed to Mr. McDearman, cashier of the Gates Banking & Trust Company, the following:

"Replying to your letter of 6th and your phone communication to-day, beg to advise that, on receipt of your letter, we took the matter up with Mr. Prince, and he said he would phone Mr. Lee and arrange it.

"As explained to you, it will be impossible to handle warehouse receipts for buyers without having the receipts here, and allowing them to substitute receipts for the original.

"We will be glad to handle the business for you at

rate of one dollar per thousand for collecting accept-
ances.

"If not satisfactory please let us know, and we will
return the receipts.

"Yours truly,      John C. Latta, Cashier."

The proof shows that McDearman showed this letter
to complainant Lee within two or three days after its
receipt, and neither McDearman nor Lee ever gave any
notice to the First National Bank of Dyersburg that the
substitution plan was not acceptable.  On the contrary,
the warehouse receipts covering the Lee cotton were al-
lowed to remain in the possession of the First National
Bank of Dyersburg, and with one payment thereupon the
acceptance of Prince & Hubbard was renewed several
times, and $5,000 remained due on a renewal thereof,
outstanding in September, 1920, when Prince & Hubbard
went into bankruptcy.

On March 5, 1920, filling an order from New England
mills, Prince & Hubbard shipped twenty-nine bales of
Lee's cotton, substituting for the warehouse receipts
covering this cotton in the hands of the First National
Bank of Dyersburg warehouse receipts covering other
cotton.

On March 9, 1920, Prince & Hubbard shipped all their
cotton in the Compress warehouse at Dyersburg to a
warehouse at New Bedford, Mass., for reasons that will
be hereafter discussed.  This cotton was largely covered
by warehouse receipts held by the First National Bank
of Dyersburg for the security of complainant Lee, and
other persons who held the obligations of Prince & Hub-
bard.  The First National Bank of Dyersburg sent bills
of lading for the cotton to the First National Bank of

New Bedford, Mass., and the latter bank took warehouse receipts from the New Bedford warehouse which the New Bedford bank held for the benefit of the First National Bank of Dyersburg.

Pending the final sale of cotton in New England the market had broken very greatly and the amount derived from said cotton lacked much of being enough to pay the indebtedness of Prince & Hubbard incurred for their various purchases. On July 20, 1920, out of the earlier sales, Prince & Hubbard paid to complainant, Lee, $4,563.44 reducing Lee's demand to $5,000. When this payment was made Prince & Hubbard asked that Lee surrender twenty-nine warehouse receipts, or rather to have his trust receipts altered so as to show that the First National Bank of Dyersburg only held thirty-two warehouse receipts instead of sixty-one on Lee's account. The effect of Prince's testimony is that Lee agreed to do this. The bank gave up twenty-nine receipts held on Lee's account. Lee says that he refused to agree to this request. At any rate, Lee's trust receipt was never changed and is still in his possession showing sixty-one warehouse receipts pledged for his security.

When Prince & Hubbard went into bankruptcy in September, 1920, there was a meeting of their creditors held at Dyersburg in October. Lee says that he then learned for the first time that his cotton had been shipped to New England, and that the First National Bank of Dyersburg was only holding thirty-two warehouse receipts to secure his claim. He further says that he then learned for the first time of the substitution of other warehouse receipts for those taken by the First National Bank of Dyersburg covering his cotton. He testifies that

he never agreed to any of these things, and had no previous knowledge of them.

The complainant, Lee, contends in his bill that the removal of the cotton sold by him from the warehouse at Dyersburg and the shipment thereof to New England early in March was a conversion in which the First National Bank of Dyersburg participated. He accordingly avers that this bank is liable for the value of his cotton at that time, which he says was thirty-one cents a pound, up to $5,000, the balance due on the acceptance of Prince & Hubbard held by him. If mistaken in this claim Lee contends that, never having surrendered his claim upon any of the warehouse receipts, and having demanded of the First National Bank of Dyersburg the sixty-one warehouse receipts at the creditors' meeting in October 1920, and the said bank refusing to surrender the same to him, it was then guilty of a conversion. Lee insists that the value of his cotton in October, 1920, was eighteen cents per pound, and that, having refused or being unable to surrender the sixty-one warehouse receipts to him at that time, the said bank is liable to him for sixty-one bales of cotton at eighteen cents per pound, or so much of such a sum as is necessary to discharge the $5,000 acceptance. In the alternative, and upon the theory that the court should hold him to have agreed to the substitution plan, complainant, Lee, submits several contentions as to his recovery, which it will not be necessary to enumerate, since we will undertake to define his rights in this discussion.

It appears that during the course of this litigation the First National Bank of Dyersburg paid to Lee about

$1,200 upon a stipulation that the rights of neither party would be affected by this payment. The First National Bank of Dyersburg denies any conversion or participation in any conversion, submits that it acted within its rights, and, as we understand, takes the position that the $1,200 paid to Lee is all that he is entitled to recover of said bank.

Other details of the case will appear in the course of the opinion, and, as stated above, the chancellor dismissed Lee's bill.

Section 23, chapter 336, Acts of 1909 (Uniform Warehouse Receipts Act), Thompson's-Shannon's Code, section 3608a22, is as follows:

"If authorized by agreement or by custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common, and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole."

Subsection 3, section 58, Id. (Thompson's-Shannon's Code, section 3608a63), is in these words:

" 'Fungible goods' means goods of which any unit is, from its nature or by mercantile custom, treated as the equivalent of any other unit."

In *Interstate Banking & Trust Co.* v. *Brown,* 235 Fed., 32, 148 C. C. A., 526, the United States circuit court of appeals for the Sixth Circuit was called on to determine whether bales of cotton were fungible goods under the law generally and under the statute quoted, and concluded that goods might be of three classes: (1) In-

herently fungible; (2) capable of acquiring that quality by agreement; (3) quite incapable thereof. The court said:

"Bales of cotton certainly do not belong to the first group; their mutual equivalency is not clear and certain. A lot of bales coming from one source might belong to the second group; their equivalency would be so possible, if not probable, that an agreement or custom therefor might well exist."

In that case the court found that the bales of cotton in controversy were of such differing varieties, qualities, grades, and weights as to be incapable of fungibility. It was found that no intermingling of the bales had in fact taken place, and that the identity of no single bale had been lost. Therefore it was said that section 23 of the Uniform Warehouse Receipts Act, above quoted, had no application.

In the case before us the proof shows, and it is assumed by counsel for both parties, that Lee's cotton did lose its identity owing to the manner in which it was handled along with the other cotton with which it was stored.

There can be no question upon the record before us but that the First National Bank of Dyersburg and Prince & Hubbard agreed that the bales of cotton stored in the Dyersburg warehouse, purchased by Prince & Hubbard, should be treated as fungible goods. This appears from the deposition of Prince, and the First National Bank of Dyersburg concedes that this course of business was followed with reference to this cotton and undertakes to justify it.

The first National Bank of Dyersburg was the agent of the complainant, Lee, or his trustee, to hold the warehouse receipts representing the cotton sold by Lee, and to see that such cotton or its proceeds was held for the security of Lee's claim. The question to be determined then is whether the bank exceeded its authority and wronged Lee in permitting this intermingling of his cotton with other cotton.

We take it that the warehouse receipts here involved are negotiable, statutory documents, although they are not set out in the record. Counsel so argue the case, and no general creditor, nor the trustee in bankruptcy, is asserting any rights to the cotton.

It is not necessary to determine whether the First National Bank of Dyersburg could justify its action by custom. We think the proof shows Lee's acquiescence and an implied agreement on his part, that said bank might so deal with the cotton.

As above noted, on March 10, 1920, the First National Bank of Dyersburg notified the Gates Banking & Trust Company, through which latter institution Lee was acting, that it (First National Bank of Dyersburg) would not handle the warehouse receipts without being permitted to hold them and to allow the buyer the privilege of substitution. The Gates Banking & Trust Company was requested, if this arrangement was not satisfactory, to so advise, and the original warehouse receipts would be returned by the Dyersburg Bank. This information was communicated to Lee within two or three days, and there was never any objection on his part or on the part of the Gates Banking & Trust Company, nor any request

from either of them, that the First National Bank of Dyersburg give up the warehouse receipts. True, the Dyersburg Bank wrote that Mr. Prince said he would telephone Mr. Lee and arrange the matter, but at the same time it wrote that it would not handle the warehouse receipts except upon the substitution plan, and called for advice if that plan was not satisfactory. Inasmuch as the Dyersburg Bank had no communication from the Gates Bank nor Lee, the Dyersburg Bank had a right to believe that, because of Prince's promised explanation, or for some other reason, Lee had agreed to the substitution plan. We can see no real reason for leaving the warehouse receipts at the Dyersburg Bank, unless it was to facilitate substitution. Lee would naturally have kept the receipts with his other valuable papers in his own bank at Gates. Gates and Dyersburg are but ten miles apart, and the receipts might have been gotten to Dyersburg at any time within an hour to permit a sale of the cotton.

While it appears that the First National Bank of Dyersburg had assumed that the substitution plan would be followed with reference to these warehouse receipts, and had allowed Lee's cotton to be shipped away from Dyersburg during a period of from one to four days before the letter of March 10th was written, still none of this cotton or its proceeds could have gotten beyond the control of the First National Bank of Dyersburg for several days after March 10th. If Lee objected to the substitution plan, anything like a prompt notice from him would have enabled the Dyersburg Bank to reclaim his cotton or its proceeds. Moreover, Prince & Hubbard continued

to be a going concern until September, doing business with the First National Bank of Dyersburg, and this bank could have doubtless made good any claim of Lee against said firm for many months after March 10th. Lee cannot be permitted to object to the substitution plan for the first time after Prince & Hubbard became insolvent, especially when he was asked to inform the Dyersburg Bank on March 10th if such plan was not satisfactory and remained silent.

We must therefore conclude that by agreement of the parties, in which Lee acquiesced, the commingling of the bales of cotton sold by Lee with other bales of cotton purchased by Prince & Hubbard in the Dyersburg warehouse was authorized. This being the case, Lee became a tenant in common as to the mingled cotton, or rather an interest in common in the mingled cotton was pledged to him, and he became entitled to look to such portion of the mass as the amount so pledged bore to the whole. As pledgee of the warehouse receipts Lee had the rights of a purchaser of such receipts, and such title to the cotton as the depositor had. Acts 1909, chapter 336, section 41, subsec. 1, and section 58, subsec. 10 (Thompson's-Shannon's Code, section 3608a43, subsec. 1, and section 3608a63, subsec. 10).

Prince testified that his firm had several hundred bales of cotton stored in the Dyersburg warehouse when he made the purchase from Lee. When the warehouse receipts for the sixty-one bales were thereafter pledged for Lee's benefit, he became, as stated, pledgee of an undivided interest in the mass. It was the duty of the First National Bank of Dyersburg to see that such a portion

of the amount brought by all the cotton as the number of the Lee bales of cotton bore to the entire number of bales in the mass was applied to the payment of the acceptance of Prince & Hubbard to Lee. Such was the bank's duty in so far as it was able to bring about this result. We do not understand that the bank held receipts for all the Prince & Hubbard cotton in the Dyersburg warehouse, but that receipts for the greater portion of this cotton were in its hands, securing purchases by Prince & Hubbard from other parties, as well as Lee. The proceeds of so much of the mass as was pledged to secure the different *cestuis que trustent* of the bank should have been divided by the bank among the various pledgees, according to their several interests, before Prince & Hubbard took any profit out of the pledged cotton.

We do not think that complainant is entitled to have recovery against the First National Bank of Dyersburg by reason of the bank's permitting the cotton to be shipped to New England. The proof tends to show that in the spring of 1920 the cotton market was very dull; that the mills in New England could not get accommodation from their banks to buy cotton in the south, such purchases involving the delays incident to transportation. The mills could get accommodations from their banks to buy cotton at hand which they could immediately spin. The evidence indicates that the best prospect for disposing of the cotton in Dyersburg was to ship it to a warehouse in the east, where it could be sold and immediately delivered. At any rate, the evidence on this point is sufficient to satisfy us that the Dyersburg Bank reason-

ably thought the cotton could be more readily sold by shipping it to the east.

The First National Bank of Dyersburg was the agent, or the trustee, of the various pledgees, to see that the proceeds of the cotton when sold was applied to the discharge of the claims for the security of which the warehouse receipts were pledged. Incidentally it was the duty of the Dyersburg Bank to further a sale to the best advantage. The rule is universal that an agent or a trustee is only held to the exercise of good faith and due diligence. *Dietz* v. *Mitchell*, 59 Tenn. (12 Heisk.), 678; 25 R. C. L., 1280.

In permitting this cotton to be shipped east we think the bank acted in good faith, and in the exercise of due diligence, according to its lights, trying to make the cotton sell to the best interest of all parties. Certain expenses were incurred in this effort to sell the cotton, which appear to us to be reasonable charges. The First National Bank of Dyersburg retained its hold on all the cotton until it was sold, and the proceeds of such sales were deposited to the credit of that bank with its New York correspondent. The Dyersburg Bank seems to have permitted Prince & Hubbard to disburse some of the proceeds of these sales, and the bank disbursed some of such proceeds itself to various parties interested.

There is no doubt but that the money paid Lee July 20, 1920, came from the sale of some of the cotton involved, and his interest in the proceeds of the commingled cotton must be charged with this payment.

A good portion of the cotton was sold in the east during the spring and summer of 1920, the best of it first.

A considerable part of it remained on hand at the time Prince & Hubbard went into bankruptcy. After some delay practically all of the remaining cotton was sold. Perhaps there were a few bales of it left at the time the bill herein was filed.

This record is not in a condition to justify us in passing a final decree disposing of the case. We have indicated our views as to the legal rights of the parties. We may summarize our conclusions as follows:

We think that the complainant must be held to have agreed to the commingling of the cotton sold by him with the other cotton and to the substitution of warehouse receipts with the First National Bank of Dyersburg. He is therefore entitled to look to the bank only for his proportionate share of the funds realized from the mass of cotton into which the bales sold by him entered.

In so far as it was able and could control the appropriation, the First National Bank of Dyersburg should have undertaken to see that the complainant got his ratable share of the proceeds of the sales of the aforesaid commingled cotton bales. The bank should not have permitted Prince & Hubbard to retain as profits any part of the proceeds of such sales until all the pledgees represented by the bank had been satisfied.

We think that the First National Bank of Dyersburg was guilty of no conversion as to the Lee cotton, nor any negligence in permitting the shipment of the cotton to New England. We are not able to tell from the record what the mass of cotton brought, nor how its proceeds were divided. Something was evidently disclosed

to the chancellor which convinced him that the complainant had received all that was due him. The transcript, however, fails to include such evidence.

We must therefore remand the case for further proceedings.

It is stated on the briefs of counsel that various parties who were interested in this cotton have filed separate suits against the First National Bank of Dyersburg. If this be true, it seems to us that these suits should be consolidated, or perhaps new parties joined to this suit. If other parties are in the same attitude as this complainant, tenants in common, have received payments, and are claiming others, payments should be equalized and contribution enforced among the parties to this end, and other equities adjusted. These are matters for the determination of the chancellor upon the remand. We cannot dispose of the case on this appeal.

The costs of the appeal will be divided, and the costs below will hereafter be determined by the chancellor.

McKINNEY, J., did not participate in this decision.