GIBSON COUNTY v. FOURTH & FIRST NAT. BANK.—96 S. W. (2d) 184.

Middle Section.     January 18, 1936.

Petition for Certiorari denied by Supreme Court, July 3, 1936.

W. W. Herron, of Trenton, and Frank Wade and Aust, McGugin & Spears, all of Nashville, for Gibson County.

Maddin & Maddin and Seay, Stockell & Edwards, all of Nashville, for Fourth & First Nat. Bank.

DeWITT, J. The issue presented is as to liability of. the Fourth & First National Bank of Nashville in the sum of $197,872.14 to the county of Gibson for alleged breach of trust in permitting the substitution by Caldwell & Co. of certain corporate stocks for bonds of Gibson county under a trust agreement, whereby said sum was lost to said county. Upon a voluminous record the chancellor denied the recovery sought and dismissed the bill. Gibson county appealed. The bank also obtained a writ of error in order to challenge certain rulings of the chancellor in admitting and excluding testimony. Both parties have therefore assigned errors, supporting them with elaborate arguments and briefs.

The following correct statement of the origin of this controversy is embodied in the findings and opinion of the chancellor:

"Gibson County for five or six years had been engaged in a road construction program, and it previously sold to Caldwell & Company three of the issues of its bonds, the proceeds of which were used in the furtherance of this program. It was not desired or contemplated that Gibson County would require or need the proceeds of the sale of these bonds at one time, but would withdraw such amounts as were required over a period of months. This had been the practice under former issues.

"The first bond sale made by Gibson County to Caldwell & Company was on August 8, 1924, and amounted to $334,000. Caldwell & Company had under this agreement the privilege of substituting other collateral from time to time with the trustee, which collateral substituted was to consist of U. S. Government, State, County and Municipal Bonds of equal market value to the collateral for which it was substituted and acceptable to the trustee.

"The second bond sale between Gibson County and Caldwell & Company was made on February 20, 1928, and amounted to $600,-000 of bonds and the agreement provided, among other things, that Caldwell & Company should have the privilege of substituting from time to time other collateral, provided the collateral offered was of equal value and satisfactory to the trustee.

"The third bond sale took place on October 15, 1929, and covered $400,000 of bonds, and among other things in the contract of sale it was provided that Caldwell & Company should have the privilege of substituting from time to time other collateral, provided the collateral offered was of equal value and satisfactory to the trustee.

"These bond sales, all of which had been satisfactory to Gibson County, amounted to $1,334,000, but none of the written agreements contained any provision giving Gibson County the right at any time to object to the collateral substituted.

"It appears that notices of the withdrawal and substitution of collateral were given to Gibson County under these bond sales, and some of these notices were mailed by the trustee as late as August and September, 1930, and several of them after trust agreement No. 4 was executed. It appears that in August and September, 1930, under trust agreement No. 3 the same class of securities as are now objected to under trust agreement No. 4 were substituted and notices given of these withdrawals and substitutions to Gibson County.

"The defendants show these withdrawals and substitutions and neither Mr. Parker nor Mr. Overall, to whom the notices were given, deny receiving them. Mr. Hassell, who served on the committee negotiating the sale of the fourth bond issue, served on the committee that negotiated the other three issues.

"On July 24, 1930, Caldwell & Company and Tigrett & Company submitted to A. D. Hassell, chairman of the Gibson County Bond

172

Committee, an offer to purchase $500,000 of Gibson County bonds. This offer was in the following language:

" 'July 24, 1930.

" 'A. D. Hassell, Chairman,

" 'Gibson County Bond Committee,

" 'Trenton, Tennessee.

" 'For Five Hundred Thousand Dollars ($500,000.00) Gibson County, Tennessee, 4½ per cent Road Bonds dated July 1, 1930, maturing without option of prior payment serially 1931 to 1955 inclusive principal and semi-annual interest, payable at some Bank of New York, we will pay par value and accrued interest to date of delivery upon delivery of bonds to us at Nashville, Tennessee.

" 'This offer is for immediate acceptance and prompt delivery of bonds, and conditioned upon their receiving the unqualified approval of Chapman and Cutler as to the legality of issue and sale and the sufficiency of tax and taxing power to provide sufficient funds to pay principal and interest when due. You to promptly furnish certified transcript and also furnish bond blanks and pay bond attorneys.

" 'We hand you herewith our certified good faith check No. 3733 for Twelve Thousand Dollars ($12,000.00) to be held by you uncashed and to be forfeited as liquidated damages if we fail to comply with the terms of this agreement; otherwise to be returned to us on delivery of bonds if above attorneys decline to approve the bonds.

" 'Respectfully submitted,

" 'Caldwell and Company,

" 'By H. C. Alexander.

" 'I. B. Tigrett and Company,

" 'By Briscoe Sealy.

" 'J. F. Parker

" 'A. D. Hassell

" 'E. C. House. Co. Ct. Clk.

" 'W. W. Herron, Attorney,

" 'C. M. Overall, Trustee.'

" 'July 24, 1930.

" 'Gibson County Bond Committee,

" 'Trenton, Tennessee.

" 'A condition of our bid for Five Hundred Thousand Dollars ($500,000.00) Gibson County, Tennessee, 4½ per cent highway bonds, date July 1, 1930, which is hereto attached, is that on delivery of these bonds to us after approval, proceeds of their sale are to be deposited with us, or banks or bankers of our selection, without interest, said proceeds to be checked upon only when needed to pay when due for work as it progresses, or for any other purpose for which it may be

legally spent for which payment is due, checks to be accompanied by approval vouchers.

" 'We or depository bank or bankers to deposit satisfactory collateral security in some bank selected by us agreeable to you, or give you other satisfactory security. Three Hundred Thousand Dollars of said funds are to be deposited with Caldwell and Company and Two Hundred Thousand Dollars with I. B. Tigrett and Company. Each of said depositories shall be only responsible for its part of the deposit, there being no joint liability for same.

" 'Yours very truly,
" 'Caldwell and Company,
" 'By H. C. Alexander.
" 'I. B. Tigrett and Company,
" 'By Briscoe Sealy.

" 'Accepted and agreed to by a resolution duly passed by the ———— this 24th day of July, 1930.
" 'J. F. Parker,
" 'C. M. Overall, Trustee Gibson County,
" 'A. D. Hassell,
" 'W. W. Herron, Attorney,
" 'E. C. House, County Court Clerk.'

"The committee representing Gibson County was composed of A. D. Hassell, who was the spokesman of the committee, J. F. Parker, County Judge, C. M. Overall, County Trustee, E. C. House, County Court Clerk, and W. W. Herron, Attorney for the County. This committee was appointed by the County Court of Gibson County for the purpose of negotiating the sale and delivery of the bonds and came to Nashville, and on August 5, 1930, consummated the agreement of sale with Caldwell & Company at the latter's office and then went over to the offices of the Fourth & First National Bank, just across the street from the building occupied by Caldwell & Company, where the trust agreement was executed by Mr. Randal Curell, Trust Officer of the Fourth & First National Bank. The bonds were then delivered to the Fourth & First National Bank as depository, to be held under the aforesaid depository agreement. This depository agreement had been signed by Caldwell & Company before the committee came over to the Fourth & First National Bank, and the agreement together with the bonds were brought over to the Fourth & First National Bank where execution of the aforesaid trust agreement was made by said bank and the bonds deposited. Before the committee came to Nashville the bonds had been signed by the County Court Clerk of Gibson County at Trenton, and were not signed by the County Judge until they reached the office of Caldwell & Company.

"After the execution of this instrument by Caldwell & Company the committee went over to the Fourth & First National Bank and had

174

a conversation with Mr. Randal Curell, the Trust Officer of that institution, and it is insisted by the complainant that at the close of the conversation the agreement was executed by Mr. Curell and the bonds delivered. This agreement is in the words and figures as follows:

" 'Nashville, Tennessee.
" 'August 5, 1930.

" 'Gibson County, Tennessee.

" 'Gentlemen:—

" 'As collateral security covering deposit made with us this day by Gibson County, Tennessee, in the amount of Three Hundred and One Thousand, Two Hundred and Seventy-Five Dollars ($301,275.00) we agree to deposit with the Fourth & First National Bank, Nashville, Tennessee, as Trustee, the following collateral:—

" '$300,000 Gibson County, Tennessee 4½% Road Bonds, Series 1930, Dated July 1, 1930.

" 'It is agreed that we shall have the privilege of withdrawing from the Trustee, collateral in equal proportion as vouchers are drawn against this deposit and paid by us, maintaining, however, at all times, collateral of equal market value of the amount of the deposit. It is also understood that we shall have the privilege of substituting from time to time, other collateral, providing the collateral offered is of equal market value and satisfactory to the Trustee.

" 'In the event Gibson County should, at any time, be of the opinion that the collateral held by said Trustee Bank is not of sufficient market value to be equal to the amount of the deposit, it has the right to so notify the Trustee Bank and Caldwell & Company and to call for such additional collateral as may make it of equal market value, and in event Caldwell & Company do not comply with this request of said Gibson County, within a reasonable time, and when notice of such request is given to Caldwell & Company, the said Gibson County may then withdraw the balance of the deposit from Caldwell & Company.

" 'Yours very truly,
" 'Caldwell & Company
" 'By H. C. Alexander,
" 'Vice-President.

" 'In consideration of Gibson County, Tennessee, agreeing to the above appointment of such Trustee, and in further consideration of One Dollar ($1.00) cash in hand paid, together with other and further valuable consideration, the receipt of which is hereby acknowledged of Gibson County, Tennessee, and in consideration of reasonable compensation to be paid to the above designated Trustee by Caldwell & Company, such compensation to be hereinafter agreed upon by said Trustee and Caldwell & Company, the undersigned hereby accepts the

above and foregoing trust and we hereby acknowledge receipt of $300,000 Gibson County, Tennessee, 4½% Road Bonds, Series 1930, Dated July 1, 1930, as collateral as above described, and agree that any and all collateral substituted from time to time in lieu of the above-described bonds, shall be of equal market value as said bonds.

" 'This fifth day of August, 1930.

" 'Fourth & First National Bank,

" 'By R. Curell,

" ' 'Vice-President.'

"The Fourth & First National Bank was agreed on as trustee by the committee representing Gibson County, because of its reputation and their confidence in it, that bank having satisfactorily handled three other bond issues for the County."

It thus appears that the bonds so purchased by Caldwell & Co., from Gibson county were to be held in trust by the Fourth & First National Bank and not delivered to Caldwell & Co., except upon substitution therefor of money or "other collateral (than the Gibson County bonds) providing the collateral offered is of equal market value and satisfactory to the Trustee."

The withdrawals and substitutions made by Caldwell & Co., and permitted and approved by the trustee bank were, as correctly found by the chancellor, as follows:

"The agreement for the sale of the bonds involved was executed as stated, on August 5, 1930. On that same day Caldwell & Company made its first withdrawal of $1,000.00 of Gibson County bonds and substituted a Municipal bond therefor. On the next day, August 6, Caldwell & Company withdrew from the trustee bank $133,000.00 of Gibson County bonds and substituted 300 shares of Union & Planters Bank stock, 45,000 shares of Intersouthern Life Insurance stock and 4,000 shares of Banco-Kentucky stock.

"On August 8, 1930, Caldwell & Company withdrew $148,000.00 of Gibson County bonds and substituted 40 shares of Fourth & First Banks, Inc., stock and 12,000 shares of Banco-Kentucky stock.

"August 9th Caldwell & Company withdrew 40 shares of Fourth & First Banks, Inc., stock, $18,000.00 of Gibson County bonds and $1,000.00 Municipal bond, and substituted 300 shares of Fourth & First Banks, Inc., stock.

"On August 25, 1930, Caldwell & Company withdrew 300 shares of Union & Planters stock and substituted 100 shares of Fourth & First Banks, Inc., stock.

"On September 3rd, Caldwell & Company paid Gibson County $16,554.40 and withdrew 9000 shares of Intersouthern Life Insurance stock.

"September 8th, Caldwell & Company paid Gibson County $11,-115.62 and withdrew 1000 shares of Banco-Kentucky stock.

"September 22, Caldwell & Company paid $8,414.26 and withdrew 100 shares of Fourth & First Banks, Inc., stock.

"September 30th. Caldwell & Company paid Gibson County $12,-593.28 and withdrew 1,000 shares of Banco-Kentucky stock.

"October 2nd. Caldwell & Company paid Gibson County $5,195.72 and withdrew 10,000 shares of Intersouthern Life Insurance stock and put up an additional 1,000 shares of Banco-Kentucky stock.

"On October 20th, 1930, Caldwell & Company paid to Gibson County $28,049.38 and withdrew 300 shares of Fourth & First Banks, Inc. stock."

When the last payment and withdrawal were made, the balance of unpaid purchase money for the Gibson county bonds was $197,872.14. The remaining collateral then held by the trustee was 26,000 shares of capital stock of the Inter-Southern Life Insurance Company and 15,000 shares of the capital stock of a holding company known as Banco-Kentucky. All of this collateral later became worthless through the failures of these corporations. All of the bonds deposited by Gibson county were withdrawn within the four days succeeding the day on which the agreement was made and the bonds deposited with the trustee. The question whether or not the trustee breached its trust in accepting these stocks in substitution for the bonds is the determinative question before the court.

The complainant county alleged in its bill that, before the trust agreement was signed by Mr. Curell in behalf of the bank and the county officials accepted it, they, being exceedingly anxious to know in what manner the bank would perform its obligations, and especially what character of collateral it would accept before it released any of the bonds, and wishing to safeguard the county against hazards, especially fluctuations in values of collateral which might be proposed, held a conversation with Mr. Curell in which they stated that, if the bonds were to be withdrawn before payment therefor in cash, they wanted the collateral which Caldwell & Co., might offer to deposit to be composed of other good and safe municipal bonds, county bonds, or state bonds, and that they did not want securities of uncertain or speculative values. It was further alleged that in reply thereto Mr. Curell assured them that he would take only county bonds, municipal bonds, and state bonds, except that in some instances he might take a small amount of certificates of banks of the highest standing for solvency and known by him to be such. It was further alleged that then, and not till then, did the representatives of the county deliver its bonds to the bank as trustee. These allegations were denied in the answer. The chancellor, over objection, admitted testimony of Judge Parker and Messrs. Hassell, Overall, and House as to this alleged conversation; but in view of the denials by Mr. Curell and certain circumstances, he found that there was no agreement between

Gibson county and the trustee bank that the trustee bank would accept as substitutes only state, county, and municipal bonds and a small amount of bank certificates. This conclusion is challenged by the county. On the other hand, the bank insists that this parol evidence—given in almost identical words by the said four witnesses, that the bonds were delivered on an assurance by Mr. Curell that he would accept only state, county and municipal bonds and a small amount of bank certificates—was inadmissible because it tended to contradict, alter, or vary the terms of the written instrument which was accepted. Obviously we must now dispose of this latter proposition.

The general rule, which is hornbook law, was carefully stated by Mr. Justice R. J. McKinney in Bryan v. Hunt, 4 Sneed, 543, 544, 70 Am. Dec., 262, as follows:

"It is a well-settled rule of the common law, independently of the statute of frauds, that where a contract has been reduced to writing, and is complete in its terms and free from ambiguity, verbal evidence is not allowed to be given of what passed between the parties, either before the written instrument was made or during the time it was in a state of preparation, so as to add to or subtract from or in any manner to vary or qualify, the written contract. The written instrument must be considered as containing the true agreement between the parties, and as furnishing the best evidence of their final intentions and acts. And this rule, excluding prior or contemporaneous stipulations or conversations, applies with no less force to simple contracts than to contracts by specialty."

In Richardson v. Thompson, 1 Humph., 151, 154, Mr. Justice Reese gave an able statement of the principle upon which this rule is founded and of the need sometimes appearing that the rigor of the rule be relaxed lest "that under the protection of the rule itself the fraudulent might gain advantages, and that in the formation of contracts, however solemn, the necessitous would yield to oppression, and the ignorant and rash blunder into mistake." However, the learned justice then expressed a doubt whether it would not be best to adhere to the severe simplicity of the general rule. Exceptions to the general rule have indeed been recognized in many cases; but the test of admissibility is as to contradiction. In Johnson v. Continental Insurance Company, 119 Tenn., 598, 107 S. W., 688, per Mr. Justice Neil, it was said:

"There are a great many cases in our Reports upon the general subject; some stating the rule, and some the exceptions to the rule. It is often difficult to decide when a case falls within one of the exceptions. The rule is that the contract cannot be contradicted or varied by parol. There are exceptions to the effect that an independent collateral agreement may be proven, and also that, when a prior parol

contract is only partly reduced to writing, parol evidence may be heard to supply the parts omitted from the writing. The rules and many exceptions may be found stated in the case of Hines v. Wilcox, 96 Tenn., [148], 158, 33 S. W., 914, 34 L. R. A., 824, 832, 54 Am. St. Rep., 823. But it has never been held that the added matter could contradict the written portion of the contract, or the written contract; but the direct reverse has been held.''

The learned justice then quoted, in support thereof, the following statement from the case of Stewart, Gwynne & Co. v. Insurance Co., 9 Lea, 104, 112:

'' 'It will be observed that under these authorities parol proof may be heard as to an independent collateral agreement, or where there has been a parol agreement, and a part only reduced to writing, the whole contract may be proven; but in neither case is the writing to be contradicted.' Again, on page 113, the court said: 'We think the evidence was properly rejected. It was certainly not an independent collateral agreement. There was but the one contract, either the one specified in the receipt or the parol contract which the defendants offered to prove. Both contracts cannot stand. They are different in their terms and in their practical results, and one must give way to the other. Nor is it a case where only part of the contract was reduced to writing. As we have seen in such cases, there is to be no conflict between the parol contract and the writing. They stand together and are consistent. The only difference is the writing does not embrace it all. In our opinion, the parol proof in this case contradicts the writing, and is therefore not admissible.' ''

■ It is generally recognized that the parts of the agreement proposed to be proved by parol must not be inconsistent with or repugnant to the intention of the parties, as shown by the written instrument. 10 R. C. L., 1030 (citing, inter alia, Cobb v. Wallace, 5 Cold., 539, 98 Am. Dec., 435); 22 C. J., 1144, and cases cited; 10 R. C. L., 1038.

■ Parol evidence of an agreement collateral to the writing, to be admissible, must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. McGannon v. Farrell, 141 Tenn., 631, 214 S. W., 432; Seitz v. Brewers' Refrigerating Machine Co., 141 U. S., 510, 12 S. Ct., 46, 35 L. Ed., 837.

■ Parol evidence may be admitted to show fraud, accident, or mistake, or the true consideration, since the consideration is not a part of the contract but merely an inducement to it, Hibernia Bank & Trust Co. v. Boyd, 164 Tenn., 376, 48 S. W. (2d), 1084; or any other inducement, such as a misrepresentation of an existing fact, Waterbury v. Russell, 8 Baxt., 159; Samuel v. King, 158 Tenn., 546, 14 S.

W. (2d), 963; or a condition upon which the contract was to take effect (but not one inconsistent with the writing); or to explain a latent ambiguity; or to ascertain the intention of the parties where the meaning of the written contract is uncertain, and the intention so ascertained is one derivable from a fair interpretation of the words used, Mills v. Faris, 12 Heisk., 451; Perkins Oil Co. v. Eberhart, 107 Tenn., 409, 64 S. W., 760. But the parol evidence here proffered does not fall within any one of these categories. It might be considered under a prayer for reformation of the written contract provided the circumstances and the dealings of the parties would show them to be entitled to ask for reformation.

Upon a close consideration of the trust agreement in question, it is evident that on its face it expresses a clear intent to vest in the trustee the power to permit substitutions within definite limitations—that the "other collateral" offered be of equal market value to the collateral withdrawn and satisfactory to the trustee; that Gibson county might call upon the trustee to demand of Caldwell & Co. such additional collateral as to make the collateral security of sufficient market value, whenever Gibson county should be of the opinion that the collateral held by the trustee bank is not of sufficient market value to be equal to the amount of the deposit; and that upon noncompliance therewith within a reasonable time Gibson county might withdraw the balance of the deposit from Caldwell & Co.

Thus the meaning of the written agreement was not uncertain. Its requirements were to be satisfied by the substitution of collateral having the double quality of equal market value and being satisfactory to the trustee. This was a definition of the kind of collateral that would be acceptable. The approval of a particular collateral offered was left to the sound judgment and discretion of the trustee. The application of the language used was to be made in the proper exercise of the power vested in the trustee. No other limitation upon the power was imposed than those limitations thus expressed; and beyond these, as the writing shows, it became a matter of sound judgment and fidelity to duty on the part of the trustee.

The written agreement itself would allow the substitution of shares of stock if of equal market value and satisfactory to the trustee. Everywhere in the instrument the security is referred to, or designated, as collateral. The word "collateral" has a broad meaning—any property or right of action, which is given as security for the fulfillment of a contract or a pecuniary obligation, in addition to the principal security. 11 C. J., 961; Bouvier's Law Dictionary; Thomson-Houston Electric Co. v. Capitol Electric Co. (C. C.), 56 F., 849. When stock certificates are so pledged, the term "collateral security" is applied to the bailment. Hughes v. Settle (Tenn. Ch.

App.), 36 S. W., 577. They may become "collateral" as well as any other incorporeal property.

Therefore it is manifest that the parol evidence offered would so change the contract as not only to eliminate certificates of stock but also to confine the collateral to public bonds and "perhaps a few bank certificates." This would be a material alteration by imposing limitations which do not appear in the instrument and are not implied from its provisions. The written instrument shows an intention not to limit the character of securities to be substituted except in two particulars which are specified. These would not be transcended by the substitution of certificates of stock of equal market value and satisfactory to the trustee in the faithful and judicious performance of duty. The understanding sought to be thus proved would contradict and vary the written agreement. This evidence does not tend to show any misrepresentation of an existing fact as an inducement to the contract; nor any condition precedent to the operation of the contract; nor any independent collateral agreement; nor any part of the contract, consistent with the writing, which was left in parol. The admission of parol evidence varying or contradicting the writing would at once annul the rule that parol evidence cannot be received to contradict or vary the terms of the written instrument. West v. Kelly's Ex'rs, 19 Ala., 353, 54 Am. Dec., 192; Jeffry v. Walton, 1 Starkie, 267.

In arriving at the conclusion that this parol evidence was admissible, the chancellor said:

"Under the depository agreement Caldwell & Company expressly conferred the power upon the Fourth & First National Bank, trustee, to determine whether the substituted collateral offered by it was of equal market value and satisfactory to the trustee, while under this agreement Caldwell & Company had the absolute right of substituting collateral, the power to finally pass on whether the collateral was of equal market value and satisfactory, was vested in the trustee. Caldwell & Company by this agreement gave to Gibson County the right at any time when in its opinion the collateral held by the trustee bank was not of sufficient market value to be equal to the amount of the deposit, to notify the trustee bank and Caldwell & Company and call for additional collateral, etc. Certainly the power conferred upon the trustee could be exercised by it when Caldwell & Company offered the substituted collateral, and the power conferred on the County as to the substituted collateral could be exercised at any time thereafter, and Caldwell & Company under this depository agreement had no authority to control the exercise of these powers by either the trustee or the County. There is nothing inconsistent or contradictory of these powers that the trustee and the County should determine between themselves what substituted collaterals would be satisfactory

to both before they were offered by Caldwell & Company, since the trustee had the right to reject if not satisfactory, and the County to reject when in its opinion the substitutions were not of sufficient market value, etc. Such an arrangement would not be in contradiction of the terms of the depository agreement, but strictly in pursuance of the powers expressly given thereby, and the evidence is admissible.''

The reason thus given is that the evidence proposed does not contradict, but relates to the exercise of the power given by, the terms of the written instrument. We are unable to assent to this view. It necessarily means that the parties entered into two conflicting agreements, one in parol, and it first, the other in writing. The trustee acted under the written agreement. The claim of admissibility is based upon the assumption that the evidence offered does not contradict the writing; and upon this assumption it is said that parol evidence may be admitted to show in what manner the written contract was to be performed. We cannot escape the view that the assumption is erroneous.

The principle here involved was applied in Mee v. Mee, 113 Tenn., 453, 82 S. W., 830, 831, 106 Am. St. Rep., 865, by the exclusion of parol evidence tending to establish a trust in the grantee under a deed to hold the property for the benefit of two nephews of the grantor and to convey it to them upon his death. Upon its face the deed vested in the grantee an absolute title, with the provision that the grantee is ''authorized and empowered to sell, to dispose of and convey, any and all of said property by sale or by will, or otherwise, as she may see fit to do, and for such purposes as she may deem best.'' For the reason that this provision was totally inconsistent with a mandatory trust upon the grantee to convey it otherwise than at her discretion, the evidence tending to show such trust was not competent.

In Rogers v. Battle, 163 Tenn., 537, 541, 43 S. W. (2d), 1071, 1072, it was pointed out that the Supreme Court of Tennessee, ''with the idea of promoting greater certainty in business transactions, has indicated a disposition to adhere more closely to the rule that parol contemporaneous evidence is inadmissible, to vary, alter, or contradict the terms of a valid written instrument''—citing cases.

The defendant's assignments of error numbered 1 to 4, inclusive, are sustained.

The conclusions stated remove from our consideration the complainant's first assignment, that the chancellor was in error in finding that the evidence did not sustain the claim that Mr. Curell assured the committee that he would accept in substitution only municipal, state, county, or government bonds, and a small amount of certificates of banks of long standing. The argument in support of this assign-

ment is predicated upon the parol evidence which we hold should have been excluded.

For the same reason we are precluded from considering the complainant's third assignment, that the chancellor erred in excluding testimony offered to show, if Mr. Curell had not agreed that he would accept for purposes of substitution only municipal, state, government, or county bonds and a small amount of bank certificates, or had indicated that he would accept such stocks as Banco-Kentucky or Inter-Southern Life, the bonds of Gibson county would never have been delivered. We must determine this controversy upon the written instrument and the acts and things done pursuant thereto.

The complainant's fourth assignment raises the question of negligence and improper performance of duty on the part of the defendant trustee through its trust officer. It is insisted that "under that portion of the trust agreement which is in writing the Fourth and First National Bank, as trustee, was actionably negligent in releasing the bonds of Gibson County from the trust and delivering them to Caldwell and Company in exchange or substitution for stocks of private corporations, and having on hand nothing but shares of the capital stock of Banco-Kentucky and Inter-Southern Life Insurance Company to satisfy the balance of $197,872.14 due Gibson County."

Under the trust agreement the only duty resting upon the trustee bank was to exercise good faith and due diligence in ascertaining whether the collateral offered by Caldwell & Co. was of equal market value to the collateral withdrawn, and satisfactory to the trustee in the exercise of such good faith and diligence. Dietz v. Mitchell, 12 Heisk., 676, 678; Coffee v. Ruffin, 4 Cold., 487, 517; Lee v. First Nat. Bank, 150 Tenn., 275, 263 S. W., 89; McCaleb v. Peery, 5 Hayw., 88; 26 R. C. L., 1372; 65 C. J., 819, and cases there cited. The question here is whether or not the trustee has committed a breach of trust. A trustee is not liable to the beneficiary for a loss or depreciation in value of the trust property not resulting from a breach of trust. The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property—such care and skill as a man of ordinary prudence would exercise in dealing with his own property, and, if he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has. If he does these things, he is not guilty of a breach of trust. See Restatement of the Law of Trusts, secs. 174, 176, 204. A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary. Id., section 201. Whether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question. Id., section 174, b.

In Tradesman Pub. Co. v. Car Wheel Co., 95 Tenn., 634, 32 S. W., 1097, 1105, 31 L. R. A., 593, 49 Am. St. Rep., 943, it was said:

"The conduct of the directors [in declaring a dividend] is to be viewed in the light of the financial status of the company at that period, and is not to be determined by its ultimate insolvency, precipitated, doubtless, by the universal paralysis of business then prevailing throughout this country." Acc. are: Briggs v. Spaulding, 141 U. S., 132, 155, 11 S. Ct., 924, 35 L. Ed., 662; United States v. American Bell Tel. Co., 167 U. S., 224, 261, 17 S. Ct., 809, 42 L. Ed., 144; In re Fulton Trust Co., 257 N. Y., 132, 177 N. E., 397, 77 A. L. R., 502.

The defendant trustee was not charged with the investment of funds. It was merely its duty to protect the debt for the bonds with collateral which would be of equal market value and satisfactory to the trustee. The question is not controlled by the statutes (Code, secs. 8497, 9596.1 et seq.), regulating the investments of funds by trustees, although these statutes set forth safe methods of investment. It is governed by the agreement of the parties. Code, section 9596.1, even recognizes the right of trustees to invest funds in securities other than bonds or mortgages when another method of investment is prescribed by the will or deed of a testator or other person establishing the trust. As hereinbefore determined, the depository agreement permitted the substitution of shares of stock provided they conformed to the required standard. This was the fourth sale of bonds made by Gibson county to Caldwell & Co. under agreements whereby the defendant bank acted as trustee of the securities for payment of purchase money. In the first agreement, of August 8, 1924, it was stipulated that collateral substituted was to consist of United States government, state, county, and municipal bonds of equal market value to the collateral for which it was substituted and satisfactory to the trustee. This limitation was not contained in any of the three subsequent agreements. In these the trustee was given larger discretion. In none of the first three agreements was there any provision giving to Gibson county the right at any time to object to the collateral substituted. This provision appeared for the first time in the agreement here in question, the fourth; so that it may be inferred that the representatives of Gibson county considered that, inasmuch as no loss had been incurred under the former agreements by the administration of the trusts by the bank through its trust officer, Mr. Curell, a sound, honest, and skillful judgment would be exercised under the broader authority conferred, and that the right reserved to object to collateral substituted would be an additional safeguard. This agreement did not provide that the trustee give notices to Gibson county of the substitutions. The evidence is in conflict whether or not notices were regularly mailed and received. Some notices were so given, but it is claimed that they were not received by the proper officers of the

county. At this point it is sufficient only to say that Gibson county, through its representatives, had a right at any time to make inquiry of the trustee as to substitutions.

As aforesaid, the remaining collateral was 15,000 shares of Banco-Kentucky stock and 26,000 shares of Inter-Southern Life Insurance Company stock. Of the Banco-Kentucky stock 4,000 shares were accepted on August 6, 1930, and 12,000 shares on August 8, 1930; then in September, 1930, 2,000 shares were withdrawn, and on October 2, 1930, 1,000 shares were added. All of the Inter-Southern Life Insurance Company stock was deposited with the trustee on August 6, 1930. The record supports the following findings made by the chancellor:

"The substitutions under the trust agreement involved were made between August 6, 1930, and October 20, 1930. Mr. Curell accepted the Banco-Kentucky stock at $12.00 per share and the Inter-Southern Life Insurance Company stock at $1.75 per share. He testifies that he kept himself informed as to the market value of these securities. He had access to several financial papers, and followed the daily quotations in the local, Louisville and Cincinnati papers. During this period of time these stocks were sold and purchased and accepted by banks over the country as collateral. After the failure of Caldwell & Company the Inter-Southern Insurance Company stock was worth $1.50 per share. The leading banks in Nashville and other parts of the country, including the trustee bank itself, accepted these securities as collateral to loans. At the time the trustee accepted these substitutions the market values of these stocks were in excess of the amounts at which they were taken by the trustee and brokers and financial institutions were buying and selling the stock at prices greater than the value the trustee placed on the stocks when they were substituted.

"From August 5th to October 20th, 1930, sales of the Banco-Kentucky stock ranged from $20.00 to $14.50 per share and prices of Inter-Southern Insurance Company stock during this period ranged from $2.25 to $1.95 per share. In December, 1930, there was a sale to the Keystone Holding Company which purchased approximately 1,500,000 shares at $1.50 per share. Some of the leading stocks of the country listed on the New York Stock Exchange fluctuated more in value than these stocks between the dates of 1929 and 1932. The trustee bank and Mr. Curell at the time these substitutions were made by Caldwell & Company had no knowledge of any fact or circumstance that would have put them upon notice of any infirmity in the stocks. At the time these stocks were substituted Caldwell & Company was a large financial institution dealing extensively in securities and the Banco-Kentucky stock and the Inter-Southern Insurance Company

stock were being bought and sold on the market and accepted as collaterals by the banks in Nashville and elsewhere.''

However, it is insisted that these securities were unsafe when they were accepted, and that the trustee knew, or by the exercise of proper diligence should have known, that this was true. As aforesaid, the test must be applied as of the dates when these securities were accepted and not by an illumined view of subsequent events.

█ It is a general rule that a trustee is not liable for mere errors of judgment, when acting honestly with ordinary prudence within the limits of the trust. 65 C. J., 819, and cases there cited. An application of this rule was made in a New York case styled In re Sprong's Estate, 144 Misc., 293, 259 N. Y. S., 77, involving liability of a testamentary trustee for loss in value of securities when he continued to hold them amid the uncertainties of financial depression. The court said that there is a broad distinction between negligence and mere error of judgment; that a fiduciary acting honestly and with ordinary prudence is not liable for unforeseeable unfortunate results which he was powerless to prevent.

The Banco-Kentucky Company was incorporated in July, 1929, as a holding company, and it began operations about October 1, 1929. Its authorized capital was 2,000,000 shares of the par value of $10 per share. The fact of its formation was heralded in the Louisville, Ky., newspapers as a great accomplishment and as a wonderful feat in finance. When its stock was ready for sale to the public it was eagerly sought, and 395,000 shares were sold for cash at $25 per share. The principal office of this institution was in Louisville, Ky. By September 19, 1929, it acquired practically the sole ownership of the National Bank of Kentucky and the Louisville Trust Company, allied institutions owned under trustee's certificates which were the form of corporate stock held by the owners of the said bank and the said trust company. This purchase was made by exchanging two shares of Banco-Kentucky stock for each certificate. Before September 19, 1929, the market price of such certificate was $50. The Louisville Trust Company ranked as one of the two outstanding trust companies in Louisville, with a reputation for conservative management over a long period; and the National Bank of Kentucky was the largest, and was regarded as the strongest, bank in Louisville and the surrounding country. Many of the directors of these institutions became owners of a large amount of Banco-Kentucky stock, some of them owning as much as half a million dollars worth of it. Some time after October 2, 1930 (the date of the approval by Mr. Curell of the last substitution of it), one of the largest individual holders of this stock purchased shares of it on open market at a higher value than that at which Mr. Curell accepted such stock in substitution.

Thereafter the Banco-Kentucky Company acquired, by payments in its stock at $25 per share, and in cash, the following: Approximately all of the capital stock of Brighton Bank & Trust Company of Cincinnati, Central Savings Bank & Trust Company of Covington, Ky., Security Bank of Louisville, Ashland National Bank of Ashland, Ky., First National Bank and Merchanics Savings Bank & Trust Company, of Paducah; more than a majority of the stock of Pearl-Market Bank & Trust Company of Cincinnati; and one-fourth of the stock of Peoples Liberty Bank & Trust Company of Covington. There is no evidence tending to show that these were overvalued in the purchases.

The National Bank of Kentucky, in its statement of December 31, 1929, showed assets, $54,701,633.36; liabilities (excluding capital stock, $4,000,000, deposits, $41,145,794.40, surplus and profits, $3,235,673.-27), $6,320,165.69.

In its statement of the same date the Louisville Trust Company showed assets, $25,181,763.72; liabilities (excluding capital stock, $1,750,000, surplus, $1,506,269.11, deposits, $17,415,486.67), $4,510,-007.94.

All of the banks the stock of which was acquired by the Banco-Kentucky Company were paying dividends, and they continued paying them up to November 15, 1930, when a financial crash occurred. Mr. Zurschmiede, complainant's witness, who was cashier of the National Bank of Kentucky and secretary-treasurer of the Banco-Kentucky Company, testified that the National Bank of Kentucky was solvent when it was closed on November 17, 1930.

During the year 1930 the Banco-Kentucky Company paid, in January, April, July, and October, dividends of 20 cents per share each, in all 80 cents, on its capital stock, not out of its surplus, but out of the dividends received by it on stocks which it had purchased. Its statement of December 31, 1929, showed a net income for the last quarter of $501,276.25.

On May 29, 1930, the Banco-Kentucky Company purchased a one-half interest in Caldwell & Co. This became known to the defendant Fourth & First National Bank, but, as there was no evidence that it knew of the details, the price paid, the chancellor excluded testimony tending to show such details. There is no evidence that the defendant had any knowledge that this purchase had not been made after full investigation as to the value of the one-half interest. The defendant could infer from the fact that bankers of such excellent reputation and large experience as those at Louisville had made the purchase that it was for a fair consideration. Although the defendant made loans to Caldwell & Co., it appears that they were secured by collateral, some of which was Banco-Kentucky stock; and the charge

that it must have known the situation is not supported by any positive evidence.

In April, 1930, the Banco-Kentucky Company loaned to Caldwell & Co. $500,000, and on July 31, 1930, it loaned to the Bank of Tennessee, a subsidiary of Caldwell & Co., $400,000—the proceeds of both loans, secured by shares of stock of Inter-Southern Life Insurance Company, being placed to the credit of the borrowers in the Fourth & First National Bank. Caldwell & Co. was an investment banking and trading concern, engaged in large and numerous transactions. These and later loans made to Caldwell & Co. not cleared through the defendant bank were probably made largely because of the possible ill effect of a failure of Caldwell & Co. upon the National Bank of Kentucky; but it does not appear that the defendant should have known, or did know, that such peril existed, especially as to the Banco-Kentucky Company. It was the disastrous failure of Caldwell & Co. in November, 1930, that caused the closing of the National Bank of Kentucky because of steady withdrawals of deposits amounting to $9,700,000; and this caused runs to be made on the other banks, resulting in crippling or closing all of them. The Banco-Kentucky then had to sell its stocks at a sacrifice. A complete collapse thus came in a period of excitement and heavy financial depression. Banks were failing everywhere.

The evidence does not warrant the charge that the Banco-Kentucky Company was a mere "financial mushroom," although some of its transactions (the details of which were unknown to the defendant) may have been speculative or unsound. The record shows in great detail the sales of Banco-Kentucky stock on the Chicago and Louisville exchanges. During the month in which the depository agreement was signed (August, 1930), many shares were sold, the prices ranging from $19 to $21 per share. Mr. Curell accepted this stock at $12 per share in valuation.

If these values were fair, the 14,000 shares which were deposited in August, 1930, were then worth about $280,000; and the market price of the 1000 shares added on October 2d appears to have been at least $12 per share. The evidence shows that leading bankers and businessmen in Louisville regarded investment in Banco-Kentucky stock as sound and desirable; and that banks in Nashville and elsewhere in the South and Southwest accepted this stock as security for loans.

As to the value of the Inter-Southern Life Insurance Company stock, the complainant took the depositions of Messrs. Theobald and Almstedt, stock and bond brokers of Louisville. Mr. Almstedt was secretary of the Louisville Stock Exchange in 1929 and 1930. The head office of that insurance company was in Louisville. About the year 1928 Caldwell & Co. acquired a controlling interest in this con-

cern. About that time, or a year or two before, it paid a dividend, but there is no evidence that any dividend was subsequently paid. On August 6, 1930, 600 shares of this stock were bought at Louisville for $2.15 a share. At such value 26,000 shares would be worth $55,900. From July 25, 1930, to October 14, 1930, the stock was bid for at about $2 and $2.25 to $2.50 asked, per share. The stock was speculative. As late as December, 1930, the Keystone Holding Company paid $1.50 per share in cash for about 1,500,000 shares. The stock was not regularly active on the market. It was not listed on the Louisville Stock Exchange. It appears that, when Caldwell & Co. bought the controlling interest, the company was having trouble with the insurance commissioner over its reserve, and Caldwell & Co. furnished $300,000 to protect it. After the purchase of stock by the Keystone Securities Company, the insurance by the Inter-Southern was taken over by reinsurance by another company, and the Inter-Southern went into a receivership and its stock became worthless. There is, however, other evidence as to the value of this stock in September, 1930. Mr. Van Dyke, who was actuary of the company, testified that in that month it was worth in excess of $2.18 per share. Mr. O'Brien who was a director of the National Bank of Kentucky and of the Banco-Kentucky Company, testified that in that month he refused $5 a share of his Inter-Southern stock, and that in the early part of November, 1930, he would not have taken $4 a share. In December, 1930, the 26,000 shares held by the defendant in trust could have been sold for $39,000.

We cannot conclude from the evidence that in August and early October of 1930 the defendant, through its trust officer or otherwise, could reasonably have foreseen that Caldwell & Co. would go down in a crash, or, if it would, that such failure would cause the runs that closed the National Bank of Kentucky, the Louisville Trust Company, and the other banks owned in large part by the Banco-Kentucky Company. It was the financial panic and depression that became very acute in November, 1930, that caused heavy withdrawals of deposits and made it impossible for these banks to procure sufficient money to meet the demands. Such disasters often come suddenly to banks. Sworn statements of the condition of those banks published in the year 1930 gave evidence of sound, solvent condition. After the crash, the assets of the two Cincinnati banks were sold to the Cincinnati Clearing House Bank, and it realized therefrom a profit of a million dollars or more. The closing of the National Bank of Kentucky and subsequent litigation impaired or destroyed values of assets or collateral. Great sacrifices and losses resulted. But for the downfall of Caldwell & Co., half of which was owned by the Banco-Kentucky Company, these failures might not have occurred. Of course, this is some-

what a matter of speculation, for there was widespread depression and anxiety over financial institutions.

We conclude that the defendant bank, through its trust officer, acted in good faith in accepting these securities, and at lower figures than the market values, that it was not guilty of a breach of the trust, and that it conformed reasonably to the standard of due diligence required by law. The bank should not be onerated with the consequences of events which were not in prospect when the securities were accepted. This conclusion is in concurrence with that of the chancellor.

It is insisted that it was error to deny a recovery of $39,000 for failure of the defendant to sell the 26,000 shares of Inter-Southern Life Insurance Company stock at $1.50 per share when an offer of that amount had been made. This was in the latter part of November, 1930, after Caldwell & Co. and the banks had failed. It is claimed that the county consented to the sale and that the said sum was lost by the failure of the trustee to sell. It is undisputed that the sale could have been made if authority had been given. The question turns upon this proviso.

On November 7, 1930, Mr. Curell had sent to Judge J. F. Parker, county judge of Gibson county, upon his request, a list of securities held by the defendant to secure the various deposits made with it by Gibson county. Later in that month the matter of selling the stock was brought to the attention of the officials of Gibson county. On November 26, 1930, its county judge and county trustee sent the following telegram to the trustee bank:

"If you as our trustee think it for the best interest to deposit twenty six thousand shares Inter-Southern Life Insurance Company stock with American Trust Company of Nashville as escrow agent under the terms of a proposed agreement of sale at $1.50 per share we consent that same be done if agreeable to pledgor and the Court and without waiving any rights except as to said stock letter follows. (Signed) W. E. Dunlap Trustee Gibson County and J. F. Parker County Judge Gibson County."

On November 27th these county officials confirmed the telegram by a letter similarly addressed, and on the 28th the Fourth & First National Bank, by Mr. Curell, sent to these officials the following telegram:

"Your wire of the twenty sixth received but no letter this morning Inter-Southern Life Insurance stock your collateral will deposit with American National Bank if and when directed by you to do so. (Signed) Fourth and First National Bank."

This telegram the bank, on the advice of its counsel, sent in answer to the telegram from the county officials, and it received no reply thereto or instructions from them. The American National Bank of

Nashville had been agreed upon as depository, or escrow agent, of the stock. On December 1, 1930, the attorney for Gibson county sent a letter to the receivers of Caldwell & Co., acknowledging the receipt of an order to creditors and stockholders of that company to appear on December 3d in the United States court at Nashville and show cause, if any existed, why the court should not approve, consent to, and confirm the sale of the stock of the Inter-Southern Life Insurance Company owned by Caldwell & Co. or in which it might be interested. It was stated that the Fourth & First National Bank was trustee for Gibson county in the holding of 26,000 shares of the stock; that, of course, Caldwell & Co. owned this stock, or equity therein, subject to the amount for which it was presumed by the county officials that the court would order a sale of the stock "unless Gibson County objects." The remainder of the letter was as follows:

"Of course, the County does not want to waive any of its other rights, or any rights in the collateral except as to this one block of stock. We have wired the Fourth and First consenting for them to deliver this stock under the condition set out in said wire which is as follows: (quoting the telegram literally). The writer presumes that that is all which will be necessary for us to do, as the Court has jurisdiction in the matter."

A copy of this letter was sent to the defendant bank and kept in its files. On March 25, 1931, Mr. Curell wrote to the receivers the following letter:

"We are in receipt of your letter of March 21st in reference to 26,000 shares of Inter-Southern Life Insurance Company stock in Gibson County Tennessee No. 4 trust.

"We are still holding this stock as our attorney was of opinion that the request made by the officials of Gibson County was not in proper form to warrant our depositing this stock for payment at $1.50 a share.

"We would have been only too glad to have made this deposit at the time requested if we had gotten the proper instructions from the Gibson County authorities."

At the April term, 1931, of the quarterly county court of Gibson county, its bond committee reported as follows:

"Relative to the last account, it being issue No. 4 of date August 5th., 1930, we beg to report that a portion of the collateral held, on today's market, is estimated to be worth approximately $40,000. We tried to reach an agreement with counsel for the Receivers and the Trustee (without waiving any of the County's rights as against the Trustee) to have this collateral delivered to the County and the account credited with the amount, but to date have been unable to obtain such an agreement."

This statement manifestly referred to' the 26,000 shares of Inter-Southern stock.

The telegram of Messrs. Dunlap and Parker made three conditions of consent on behalf of Gibson county: (1) That the trustee bank consider it for the best interest of the county; (2) that the proposed sale be agreeable to the pledgor; (3) that the county make no waiver of any rights except as to said stock. The answer of the bank made it clear that the stock would be deposited in escrow only upon specific direction by Gibson county. This meant that the bank would not accept any responsibility for the sale; that the bank expected the county to obtain the consent of the pledgor; and that the bank would only act upon specific and unqualified direction given to it. This position it had a right to take, for it was then only a custodian. It was not appointed a trustee with power to sell. If Gibson county was willing, without qualification, to sell the stock (as it now claims), why did it not say so in plain terms when the answer of the bank by wire was received? It knew then that such sale must be made only on its unqualified authority and direction.

The letter of the county attorney to the receivers of Caldwell & Co. recited that an order to creditors and stockholders of that company had been made to show cause, if any existed, why the stock of Inter-Southern Life Insurance Company should not be sold under the offer. It does not directly appear in the record whether or not the United States court approved and confirmed the sale of all this stock owned by Caldwell & Co. or in which it was interested. Nothing is shown specifically as to any action of the court as to these 26,000 shares. It does appear that nearly 1,500,000 shares were sold, and it is fairly inferable that these were sold by authority of the court; but it does seem that, unless Gibson county objected, as lienor, the court could and would have ordered the sale of these 26,000 shares as part of this stock owned by Caldwell & Co. or in which it was interested. In fact, it was not sold. The letter of the county attorney, a copy of which came to the bank, showed again the county's consent on conditions stated in its telegram, which was copied into the letter. The letter referred to it as "the condition," and then it was stated that the writer presumed that that was all that was necessary for the county to do, as the court had jurisdiction in the matter. Now, in the absence of evidence that the court ordered the sale of these 26,000 shares, how can we say that it was the duty of the bank to deposit the stock in escrow? Was it the duty of the bank to procure such authority from the court? We do not think so. It was merely a custodian to hold the stock in trust as security, and it was not charged with the duty of procuring a sale. It expressed its willingness to deposit the stock in escrow whenever it should be directed to do so. It was not for it to fulfill the condition referred to in the letter as set forth in the telegram. The direction re-

quired of Gibson county was not given and the stock was not deposited. Therefore we must concur in the following findings and conclusions of the chancellor:

"The direction of Gibson County to the trustee Bank to deposit the 26,000 shares of Inter-Southern Life Insurance stock under an agreement for a sale at $1.50 per share, was not an unqualified and specific direction, and when the trustee Bank wired in answer therefor for specific direction, the County failed to give it.

"The trustee had no right to dispose of the stock except as directed by the beneficiary, and the beneficiary declined to give specific directions when requested to do so, and after it had been notified by the trustee Bank that the stock could be sold at $1.50 per share. Therefore it is not liable to Gibson County for failure to deposit the stock and dispose of it at $1.50 per share."

These conclusions render immaterial the defense of estoppel by failure of the county to object to this collateral upon receipt of notices alleged to have been sent to it from time to time as withdrawals and substitutions were made—an estoppel by acquiescence or ratification, if supported by the facts. However, the extensive evidence upon this issue has been carefully examined and considered, as upon any review of this opinion this issue might be deemed material. The chancellor's discussion and findings are as follows:

"It is claimed by the defendant trustee Bank, that notices of all of these withdrawals and substitutions were sent to Gibson County. All of these letters were addressed to the County Judge of Gibson County, or to C. M. Overall, County Trustee, except two of them of the date of September 8th and September 22nd, to R. K. Taylor, County Judge, and the one of October 2nd, to J. F. Parker, County Judge. Judge Parker, Mr. Overall and Judge Taylor deny that they received any of these notices, but Mr. Overall who had acted on the bond committee admits that he received the notices dated September 3rd and 30th, and October 20th, all of which were addressed to him as County Trustee. At the time he received these notices he had been succeeded in office as County Trustee, by W. E. Dunlap, but remained in the employ of Mr. Dunlap for approximately a month and said nothing to him about these letters, nor did he mention them to any other member of the old committee.

"It is difficult to understand how these three letters which Mr. Overall admits he received, and which were handled by the trustee Bank in the same way as all the other letters relating to this matter, should have reached him and the other notices should not have reached Judge Parker or Mr. Overall before he retired from office; nor is any reason suggested why the trustee Bank would send these three notices and withhold sending the others, since it and Caldwell & Company

were at this time handling thousands of dollars of money and securities for Gibson County.   .   .   .

"The system employed by the trustee Bank in sending out notices of withdrawals and substitutions under the trust agreement involved in substance is shown to be, what is termed 'swap sheets,' were prepared by Caldwell & Company in triplicate.  These sheets listed the securities which Caldwell & Company desired to exchange for securities in the hands of the trustee.  These sheets, with securities proposed for substitution, were taken to the desk of Mr. Curell, and after he approved the substitution or withdrawal the sheets were initialed by him and the substitutions were made and the securities being withdrawn were delivered to the representative of Caldwell & Company.  One of these 'swap sheets' was left in the security box, one was given back to Caldwell & Company and a third, a pink sheet was sent to the bookkeeping department for entry.  The bookkeeping department then posted the information from this sheet and it was then returned to Mr. Curell unfiled until a letter came over from Caldwell & Company notifying Gibson County or its representative of the substitution.  This letter would then be signed by Mr. Curell in the lower left-hand corner and sent back to the bookkeeping department where the letter was compared with the pink sheet and would then be mailed out and the pink sheet placed in the permanent folder file.  Caldwell & Company would send two copies of the letter of notification together with an envelope addressed and stamped.  This envelope would also contain the return address of Caldwell & Company.  These letters after verification were placed in a wire basket kept by the Bank for that purpose and would be taken up during the day by the Bank's mail clerk.  They would be taken to the transit department on the third floor of the bank building.  When they reached there all unstamped and unsealed mail was sealed and stamped, and after having been sorted and checked against the addresses the mail would be placed in a mail pouch and sent to the post office in the afternoon by an employee of the Bank.  This was the regular manner followed by the Bank in handling all of its mail which consisted of about 1,000 letters a day, and not more than a dozen letters a week were returned for all reasons.  The different employees of the Bank who checked these 'swap sheets' had charge of the mailing system, addresses, bookkeeping, etc., were introduced and show that this was the method of handling the mail, and in particular identify the letters and 'swap sheets' in the instant case, and state that they were handled in the usual manner.  As stated, these letters contained on the envelope the return address of Caldwell & Company.  Messrs. Smith and Goodloe who were employees of Caldwell & Company, testify that Mr. Smith was under the supervision of Mr. Goodloe and that all of these matters passed over Mr. Smith's desk.  Both witnesses testify that none of

the notices of withdrawals and substitutions sent out by the trustee bank on the trust agreement involved, were returned.''

The complainant insists that the notices were never mailed; that they must have been redelivered to Caldwell & Co. and withheld. The evidence does not warrant this contention. The testimony of the witness Choate that in March, 1931, Mr. Curell told him that the correspondence was carried on at Caldwell & Co.'s and that he knew nothing about it was positively denied by Mr. Curell. Nor is any weight to be given to a statement of Caldwell & Co.'s trust officer, Goodloe, in a confidential letter of December 19, 1929, to two of his associates as follows:

''We have not been notifying municipal authorities in cases where I feel certain they would question the collateral. Just at present we would better let well enough alone.''

The evidence shows that this and other statements of this witness had no reference to collateral held by the Fourth & First National Bank as trustee. Copies of all the notices claimed to have been sent to the complainant are in the record. As the chancellor found, it was for the bank to send them, not Caldwell & Co. We concur in the foregoing discussion and findings of the chancellor.

█ In seven assignments the defendant complains of the admission over objection of questions propounded to the witness Goodloe and his answers thereto, on cross-examination—seeking to prove admissions on his part in his testimony before the General Assembly's Investigating Committee in 1931. We think that this was not error, especially in a cause heard by a chancellor. The questions purported to lay grounds for contradiction of the witness by showing what he said before the committee, and under oath. They did not relate substantively to the issue as to violation of the trust agreement by the defendant bank.

█ In one more assignment it is complained that it was error to sustain objection to an answer made by Goodloe that Mr. Curell handled the trusts ''absolutely legally and morally, and in every respect just as close to the wording and spirit of the trust agreement as they possibly could,'' etc. Such opinion would, by itself, be determinative of the issue which it was for the court to decide.

These eight assignments of error by the defendant are overruled.

We concur in the result reached by the chancellor, and his decree dismissing the bill in this cause is affirmed, at the cost of Gibson county and its sureties.

Faw, P. J., and Crownover, J., concur.